John JAMES; Mary James, Plaintiffs–Appellants,

v.

Cecil B. JACOBSON, Jr., M.D.; Reproductive Genetics Center, Limited, Defendants–Appellees.

No. 92–2196.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 2, 1993.

Decided Oct. 4, 1993.

William O.P. Snead, III, Law Offices of William O.P. Snead, III, Fairfax, VA, argued (Mark A. Towery, Ann LaCroix Jones, Judith G. Ising, on brief), for plaintiffs-appellants.

Richard McMillan, Jr., Crowell & Moring, Washington, DC, argued (Scott L. Winkelman, Ian K. Sweedler, on brief), for defendants-appellees.

Before ERVIN, Chief Judge, and PHILLIPS and WILLIAMS, Circuit Judges.

## OPINION

PHILLIPS, Circuit Judge:

This is an appeal by John and Mary James (pseudonyms) from an interlocutory order of the district court denying the Jameses' request that they be allowed to proceed anonymously in the trial of their medical malpractice/fraud action against Dr. Cecil Jacobson. Two questions are raised: whether the interlocutory order is appealable under the "collateral order" doctrine and, if so, whether the district court erred in denying the request for anonymity. We hold that the order is appealable and, on the merits, that the dis-

trict court erred. Accordingly, we vacate the order and remand with instructions.

## I

In 1980 the Jameses, a childless couple who wanted children, went to Dr. Jacobson, a medical doctor who specialized in the diagnosis and treatment of infertility, for consultation. Following diagnosis, they engaged his professional services to provide artificial insemination of Mary James with the sperm of John James. Dr. Jacobson performed several artificial insemination procedures, representing to the Jameses that the semen used was that of John James. As a result of the inseminations, Mary. James became pregnant and had two children. Shortly thereafter, acting on the assumption that John James was the children's biological father and that they had fulfilled their desire to have children, Mary James underwent tubal ligation.

In 1991, the Jameses learned through media reports of criminal charges against Jacobson that, if some of the charges were true, Jacobson, not John James, might be the biological father of the two children. Laboratory tests conducted in preparation for the criminal prosecution then revealed that Jacobson almost certainly was their biological father.

The James parents testified, under pseudonyms, at Jacobson's criminal trial. Jacobson was convicted on various charges, including some that involved the fraudulent use of his own sperm rather than that of promised donors in impregnating patients.[1] *See United States v. Jacobson*, 785 F.Supp. 563 (E.D.Va.1992).

Concerned about the effect upon the children if they should learn that John James was not their biological father, the Jameses sought professional advice. Based upon that advice, they revealed to the children that due to a "mix-up" in the insemination procedure John James was not their biological father, but they did not and have not yet revealed the further fact that Jacobson almost certainly is.

In early 1992, the Jameses commenced this action under the diversity jurisdiction against Jacobson. Before filing their complaint, they obtained an *ex parte* protective order permitting them, *inter alia*, to use the pseudonyms, John James and Mary James, and did use them, revealed as such, in their original complaint. That complaint alleged a classic medical malpractice claim against Dr. Jacobson, specifically, that by his conduct he had, *inter alia*, breached the duty of care owed the Jameses as patients, thereby causing them physical and marital injuries, for which they sought damages.

After being served, Jacobson moved for revision of the *ex parte* protective order on the basis that, as framed, it was unfair to him in various respects. The district court then amended the order to provide that plaintiffs must file under seal an amended complaint revealing their true names; that if the signatory judge presided at trial, no party or witness should testify "except under his or her true name", but that this was subject to change if another judge presided at trial; and that the question of procedures to be followed by defense counsel in discovery and in investigative questioning of witnesses concerning the plaintiffs' allegations was to be left open pending further orders. J.A. at 93–94.

Plaintiffs then filed the required amended complaint under seal.

Following consultations between counsel, agreement was reached as to most aspects of a procedure for preserving the plaintiffs' anonymities during pretrial investigation and discovery. Remaining areas of dispute were resolved by the district court after a hearing. A resulting order forbade disclosure by defendants and their counsel or representatives of any information that directly or indirectly identified plaintiffs or their children to any person unless that person first executed a non-disclosure agreement enforceable by the contempt sanction; required that all papers filed with the court or disseminated to any person who had not executed a non-disclosure agreement should use the "James"

---

1. The intense media publicity that attended Jacobson's criminal prosecution focused primarily on the conduct alleged by the Jameses.

pseudonym in reference to plaintiffs and required that any document that identified plaintiffs or the children either directly or indirectly be filed under seal, with redacted copies to be placed in the public files; required defendants to disclose to plaintiffs' counsel all insurance company personnel to whom the plaintiffs' true identities had been or would be disclosed, and required plaintiffs in turn to disclose to defendants' counsel the names and addresses of all persons to whom plaintiffs had confided matters alleged in their pleadings; forbade defendants' representatives during investigation to reveal, either directly or indirectly, the true identities of plaintiffs to any person other than those insurance company personnel already aware, unless the person first signed a non-disclosure agreement; required defendants to obtain leave from a designated magistrate judge, on prior notice to plaintiffs, to contact any person thought to have relevant information about the case, with opportunity for plaintiffs to be heard before leave was granted; allowed defendants to notice and depose witnesses using the "James" pseudonyms in notices and subpoenas, with depositions to be conducted using pseudonyms when the witnesses were unacquainted with plaintiffs, and using actual names when the witnesses were acquainted with the Jameses and had knowledge of the matters alleged by plaintiffs, and with pseudonyms to be used in any transcriptions of depositions. J.A. at 309–315 (order).

Investigations and discovery then proceeded under these conditions. As the end of the discovery period neared, defendants sought to subpoena both of the "James" children for depositions and to require both the plaintiffs to submit to "mental" examinations pursuant to *Fed.R.Civ.P. 35.* When the plaintiffs moved to quash the subpoenas and resisted the motion to compel their submission to mental examinations, a magistrate judge granted the motion to quash the subpoenas but ordered the plaintiffs to submit to mental examinations.

As the trial date approached, the plaintiffs, citing the uncertainty created by the court's extant order that precluded their use of pseudonyms at trial if the signatory judge presided but left the matter open if another judge presided, moved for a "final, appealable" order resolving the matter without regard to the identity of the trial judge. In their supporting memorandum, the plaintiffs expressly repeated their earlier representations that if they were not permitted to proceed anonymously at trial, they would voluntarily dismiss the action. J.A. at 105–06. Following a hearing, the district court ordered that, without regard to the identity of the trial judge, plaintiffs should not be allowed to testify anonymously at trial. The court then declined to certify the order for appeal under 28 U.S.C. § 1292(b).

The Jameses then filed a notice of appeal from the non-anonymity order, and moved unsuccessfully in the district court for a stay of proceedings in that court pending the appeal. When Jacobson then moved in this court for dismissal of the appeal on the basis that the order was a nonappealable interlocutory one, we reserved decision on the motion pending hearing on the merits and stayed proceedings in the district court.[2]

## II

■ We first address the question of the appealability of the non-anonymity order. There is no dispute that as an uncertified interlocutory order it is appealable only if it falls within the familiar collateral order doctrine of *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

In this court's formulation, that doctrine allows appeal of such an order only if it "conclusively determines the question in the trial court, resolves an important question independent of the subject matter of the litigation, is effectively unreviewable on appeal from a final judgment . . ., and presents a serious and unsettled question upon ap-

---

**2.** Between the date that notice of appeal was filed and the date of our stay of proceedings in the district court, the district court granted Jacobson's motion for summary judgment dismissing the Jameses' medical malpractice claim as time-barred under Va.Code 8.01–243.C. The court, however, allowed the Jameses to file an amended complaint adding a fraud claim in order to avoid dismissal of the entire action. The Jameses filed such an amended complaint on which, as presently structured, the case would go to trial.

peal." *Taylor v. Nelson*, 788 F.2d 220, 224 (4th Cir.1986).

There is no question that the anonymity-at-trial question was an important one that was conclusively determined by the district court. Indeed, its importance was recognized by all involved, and its conclusive resolution was the sought and avowed purpose of the order. Neither is there any question that the order will be effectively unreviewable on appeal from a final judgment. The parties in fact agree on these two points and only contend over whether the order resolves an important question independent of the merits of the litigation, and whether it presents a serious and unsettled question on appeal. We hold that it meets both these criteria as well as those upon which the parties agree and hence is appealable.

■ The requirement that the order resolve an important question independent of the merits of the litigation reflects the central concern of the final judgment rule: that piecemeal review of decisions that are but steps toward final judgments on the merits are to be avoided, because they can be effectively and more efficiently reviewed together in one appeal from the final judgments. But decisions affecting "claims of right separable from, and collateral to, rights asserted in the action", *Cohen*, 337 U.S. at 546, 69 S.Ct. at 1225–26 aren't of that type and therefore don't pose the specific mischief at which the final judgment rule is aimed. In accord with the Fifth Circuit, we think a decision, such as the one here, refusing to allow parties to proceed anonymously at trial is "separable from and collateral to" the merits of the action. *See Doe v. Stegall*, 653 F.2d 180 (5th Cir.1981); *Southern Methodist Univ. Ass'n. v. Wynne & Jaffe*, 599 F.2d 707 (5th Cir. 1979). It is not a step toward final judgment on the merits that will merge in and be reviewable on any appeal from that judgment (even assuming that review at that point could be effective).

Jacobson seeks to show its inseparability here by arguing that the question of the plaintiffs' anonymity bears upon their claim of injury to their privacy interests; hence that it necessarily will "affect ... decision of the merits", *Cohen* 337 U.S. at 546, 69 S.Ct.

at 1225. We disagree, for this argument depends upon a characterization of the nature of the Jameses' claims of mental and physical injury that is not borne out by the record. As will be more fully developed in our merits discussion, the Jameses' claims of compensable harms do not encompass harms to themselves from feelings of public obloquy or of shame were their true identities revealed, hence would not be furthered by court-ordered anonymity. For this reason, the anonymity question is not in any way "enmeshed" in the merits issues as now defined. *Cf. Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978) (class certification ruling not separable because issues "enmeshed" in merits issues).

As to whether the ruling would present a "serious and unsettled question on appeal", Jacobson contends that it wouldn't, principally because the order sought to be challenged is a discretionary one. Exercises of discretion, he says, can't be thought to present "serious and unsettled questions" on appeal, for what is contemplated by that requirement are questions whose resolution will lay down principles of general application, helpful in future litigation. Appeals of discretionary rulings, the argument goes, can't have that quality because they can only yield fact-specific, one-shot rulings whose force will be exhausted with the case at issue.

There certainly is support for the general proposition that discretionary rulings do not, for a number of reasons, present the kind of "serious, unsettled questions" that make them good candidates for collateral order review. *See, e.g., Sobol v. Heckler Congressional Comm.*, 709 F.2d 129, 131 (1st Cir. 1983) (because to "review a fact-specific exercise of discretion ... would not be of any assistance in future cases"); *Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l.*, 455 F.2d 770, 773 (2nd Cir.1972) (could "open the way for a flood of appeals concerning the propriety of a district court's ruling on the facts of a particular suit"); *see generally* 15A C. Wright, A. Miller, E. Cooper, *Federal Practice & Procedure: Civil* § 3911.5, pp. 432–435. But though the reasons noted in such cases as *Sobol* and *Weight*

*Watchers* for not entertaining interlocutory appeals of discretionary rulings make perfect sense as general propositions, we know of no decisions, certainly not in this circuit, that discretionary rulings *never* could qualify for collateral order appeal. Nor is such a bright-line rule likely ever to emerge, for it would require a comparably bright-line test of "discretion" itself that is not possible. For, as we all know, there are discretionary rulings and discretionary rulings. There is what could be called the "pure" variety—*e.g.* how much security to require, *see Cohen,* 337 U.S. at 547, 69 S.Ct. at 1226—that clearly could not be thought to warrant interlocutory review, for exactly the reasons expressed in *Sobol* and *Weight Watchers.* But there is also the discretionary ruling (or, more properly, ruling on a discretionary matter) that upon analysis turns out to be driven by legal or factual misapprehension or purely personal predilection or preference, that could well be thought to warrant immediate review and correction because of the seriousness of the ruling for precedential as well as immediate purposes.

As will be more fully developed in our discussion of the merits, we think that the ruling here is properly seen as one of the latter type—a ruling that, though undoubtedly on a discretionary matter, seems to have been driven essentially by a personal predilection that effectively declined to exercise discretion or that, if more properly seen as an exercise of discretion, was made on the basis of factual and legal misapprehensions that make the discretion exercised not an "informed" discretion. Accordingly, we conclude that this order does not have the quality that generally warrants refusal to entertain appeals from interlocutory rulings on discretionary matters. By the same token, we think it presents a serious question—whether anonymity may be so refused—that requires settlement for precedential purposes as well as more immediate ones.

Having concluded that the order is appealable under the collateral order doctrine, we turn to the merits.

### III

■ The decision whether to permit parties to proceed anonymously at trial is one of many involving management of the trial process that for obvious reasons are committed in the first instance to trial court discretion. This implies, among other things, that though the general presumption of openness of judicial proceedings applies to party anonymity as a limited form of closure, *see Stegall,* 653 F.2d at 185, it operates only as a presumption and not as an absolute, unreviewable license to deny. The rule rather is that under appropriate circumstances anonymity may, as a matter of discretion, be permitted. This simply recognizes that privacy or confidentiality concerns are sometimes sufficiently critical that parties or witnesses should be allowed this rare dispensation. A necessary corollary is that there is a judicial duty to inquire into the circumstances of particular cases to determine whether the dispensation is warranted.

■ As is ordinarily the case where discretion is committed to trial courts, some guidelines for its exercise in the form of factors that should be considered by courts considering anonymity requests have been judicially recognized. They are not many, for the question happily is one that is not too often raised. But some can be gleaned from the relatively few cases—both at trial and appellate levels—that have wrestled with the problem. Among them are the following that have relevance to this case: whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature; whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; the ages of the persons whose privacy interests are sought to be protected; whether the action is against a governmental or private party; and, relatedly, the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously. *See Doe v. A Corp.,* 709 F.2d 1043, 1044 n. 1 (5th Cir.1983) (anonymity of both parties warranted to protect attorney client confidentiality privilege); *Doe v. Stegall,* 653 F.2d at 185–86 (anonymity warranted to protect minor plain-

tiffs against risk of violence from revelation of unpopular personal beliefs); *Southern Methodist Univ. Assn.*, 599 F.2d at 712–13 (anonymity properly denied to Title VII claimants who sought only to protect against possible economic retaliation and identified no threat to any "highly private matter" that outweighed risk of unfairness to defendant-employee); *Candy H. v. Redemption Ranch*, 563 F.Supp. 505 (M.D.Ala.1983) (anonymity allowed in suit by pregnant 19–year old alleging fraudulent inducement to enter defendant's Home for Girls); *Doe v. United Services Life Ins. Co.*, 123 F.R.D. 437 (S.D.N.Y. 1988) (anonymity allowed because of sensitive privacy and retaliation concerns in suit by homosexual against insurance company alleging discriminatory practices; no unfairness to defendant who was aware of claimant's true identity); *Doe v. Hallock*, 119 F.R.D. 640 (S.D.Miss.1987) (anonymity not warranted in sexual discrimination and harassment suit against private parties where no privacy interest beyond personal embarrassment identified).

Here, as generally, the judicial recognition of such factors as guides to a proper exercise of discretion operates to impose legal constraints on its exercise by trial courts and in turn to guide our review—to which we now turn.

■ Our review is of course under the familiar abuse of discretion standard, a standard that, though familiar in statement, is not necessarily that simple in application. For "abuse of discretion", as courts and commentators have come increasingly to recognize (and confess), can occur in a number of ways. *See generally* Rosenburg, *Judicial Discretion of the Trial Court, Viewed From Above*, 22 Syracuse L.Rev. 635, 655 (1971). Perhaps its most obvious manifestation is in a failure or refusal, either express or implicit, actually to exercise discretion, deciding instead as if by general rule, or even arbitrarily, as if neither by rule nor discretion. *See Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 661–62, 98 S.Ct. 2552, 2556–57, 57 L.Ed.2d 504 (1978). Another way, crucial here, is by failure, in attempting to exercise discretion, adequately to take into account judicially rec-

ognized factors constraining its exercise. *See Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 19, 103 S.Ct. 927, 938–39, 74 L.Ed.2d 765 (1983) ("discretion must be exercised under the relevant standard prescribed by this court"). Finally, discretion may be abused by an exercise that is flawed by erroneous factual or legal premises. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401–02, 110 S.Ct. 2447, 2458–59, 110 L.Ed.2d 359 (1990) (clearly erroneous factual findings or legal errors underlying discretionary fee award ruling constitutes abuse of discretion).

■ We have concluded, with all respect for the able district judge who made this ruling, that there is enough of each of these present here to require that we vacate this order and remand for further proceedings. In fairness to all, and in order to explain the conditions upon which we will remand, we discuss briefly the several ways in which we believe this order fails to pass muster as a proper exercise of the discretion committed.

As anticipated in our earlier discussion of the appealability issue, a principal concern raised for us by the record is whether the ruling actually reflected a true exercise of discretion or was instead based essentially upon the court's conviction that party or witness anonymity at trial in this type case is never permissible. This obviously is a difficult and sensitive matter to determine on a cold appellate record, but on that record—which is all we have—the indications against a truly discretionary choice seem too plain to avoid. There is of course no question that the court knew that, technically, the ruling was one committed to its discretion, with all that that implies for making reasoned choice based upon factors specific to the case. Indeed, it's plain that the court looked at the problem both from the plaintiffs' and the defendants' viewpoints, suggesting a balancing process. But in the end, the impression is powerful indeed that its conclusion was based upon a general rather than a particularized assessment of the equities involved: that as a general proposition party-anonymity at trial is simply not permissible.[3] The

---

**3.** At least as to plaintiffs in civil actions seeking      compensatory damages against private party de-

court's original ruling, made without elaboration in the order, in fact almost announces itself as a flat rule of general application based upon strongly felt personal predilection, for in it the court carefully refused to make it binding as law of the case (assuming it could) upon any other judge who might conduct the trial. "If the undersigned is the judge conducting the trial of this action, no party or witness may testify at trial except under his or her true name; however, this determination is subject to change by the trial judge other than the undersigned." J.A. at 93.[4] The fact that later, responding to plaintiffs' request, the court amended it to make it binding in form without regard to the identity of the trial judge, does not alter the implication. At this point, it was at least still possible (presumably most likely) that the order-judge would be the trial judge. Under the circumstance, it seems obvious that the amended order simply reflected the basis upon which the original was entered— *i.e.* as a matter of personal unwillingness to allow anonymity at trial.

We also have to conclude from the record that the district court so continuously misapprehended the nature of the Jameses' claim—*particularly as it defined the harms* for which they sought compensation—that the court's judgment about the threat of unfairness to the defendant posed by anonymity was critically flawed. As indicated in our general ruminations about the anatomy of trial court discretion, such misapprehensions of factual and legal predicates can lead to flawed rulings in matters of discretion, and we think this is one such.

Despite the strong record indicators that the ruling here was based more on a judicially-adopted general rule than on a true exercise of case-specific discretion, we'd be reluctant to rest a determination that discretion was abused solely on that basis. As indicated, making so sensitive a judgment on a cold appellate record which does not reflect an express disclaimer of discretionary power by the trial court is a chancy business at best; we're reviewing the ruling of an able judge who obviously was aware that the matter was one technically committed to his discretion; and there are plain indications that the judge did address the conflicting interests of the parties involved before entering the challenged order.

Assuming, for this reason, that a fairer view of the trial court's decisional process might be that discretion was being exercised, with alternatives being actually considered, it is clear that the principal factor counselling against anonymity for the district court was the risk of unfairness to the defendant. Two principal concerns of the court are expressed on the record—both in colloquy with counsel leading up to entry of the order. The first was that the very knowledge by the jury that pseudonyms were being used would convey a message to the fact-finder that the court thought there was merit to the plaintiffs' claims of intangible harms. *See* J.A. at 293 (transcript of hearing) ("[T]he jury is bound to say, 'Well, this really must be serious. The court won't even make these people tell us who they are'"). The second was that

---

fendants. The district court had actually allowed the Jameses to testify anonymously in the criminal action against Jacobson; and it may be doubtful that the court would have thought a *governmental-entity defendant as subject to* prejudice as it thought Jacobson, as a private defendant, was.

4. The impression conveyed by the order—of flat rule rather than discretionary choice—is heightened by comments of the court in colloquy with counsel during a pre-order hearing. "Frankly, I don't mind, obviously, that the identity be kept within the confines of the file and during the pendency [of trial], but frankly, I'm not willing to have people testifying in this court under pseudonyms and *that sort of thing. That, to me, is* improper." J.A. at 74. "That [harm to the children] seems to me a risk you take when you undertake to try your case in what is going to be a public forum. I'm not trying to discourage litigation, but to be able to proceed in secret, in effect, is not my notion of how a case ought to proceed." *Id.* at 75. "I'm telling you *right now* that if I try this case, there is not anybody [in] this courtroom testifying under a pseudonym. We have had public figures who don't want to be identified with this or don't want to be identif[ied] with that because it will ruin their careers. It doesn't wash. I realize there are embarrassments to this, but I'm not willing to treat it as other than a public hearing.... I'm perfectly willing to keep the file sealed, I'm not willing to allow the case to proceed under pseudonyms as far as the trial is concerned." *Id.* at 76.

pseudonymity would unfairly impede defendant's ability to impeach the plaintiffs' credibility. *See id.* at 290 ("If I don't have to reveal anything but my voice to a jury, ... it affects my credibility. I think the defendant is entitled to explore who it is that is making a claim, what their name is, where they work, those sort of things that ... are important to the credibility of that witness").

So far as the record reveals, this two-pronged concern about prejudice to the defendant was the only case-specific factor considered by the court to warrant its ruling against anonymity. And it was this concern that prevailed with the court when weighed in the balance against the countervailing risk of harm to the children from revelation of the full circumstances of their birth—harm which the court was "willing to accept" would be "damaging to them, and perhaps severely damaging to them." J.A. at 289. The problem with this assessment of relative risks is that it failed adequately to take into account two proffers by the Jameses' for conduct of the trial that would, if properly administered, relieve both concerns. In one, they disavowed any request to be protected at trial against the risk of their *indirect* identification. Specifically, the proffer was that

> anonymity in this case would be limited to the pseudonym that they use, not to who they are in every other respect. That is, their profession, where they come from, what they do, what they stand for; and all of the other portions of cross-examination would be there. The only thing that would be absent would be their true name to protect the identity of their children.

J.A. at 291.

The basis for this proffer—which obviously accepts some risks of indirect identification of the parents to persons present at the trial or who might later take the opportunity to parse any trial transcript—is revealed in affidavits of a consulting psychiatrist and a consulting psychologist filed by the Jameses in support of their motion. These make the point that the specific risk of harm to the children that should be avoided is narrowly only the risk of sudden, unplanned revelation *at this particular time in their lives* while they are in particularly vulnerable pre-ado-

lescence and soon after the revelation that their conception was by artificial insemination and that John James was not, as they had supposed, their biological father. *See* J.A. 331, 337 (affidavit of Kenneth L. Kaplan, M.D.) ("in the best interests of their children to keep this information a secret, at least for the present time"); J.A. 338, 339 (affidavit of Linda J. Cimarusti, Ph.D) (specific risk of "public and unplanned revelation" as opposed to planned sequential revelation by parents over time). We therefore interpret the proffer as designed to guard the children only against the risk of revelation through contemporary reportage of the Jameses as parties to this litigation by use of their true names.

The other proffer was designed to relieve the court's concern that the jury's very knowledge that pseudonyms were being used would tend to validate the claim of intangible harms from the wrongdoing alleged. In order to avoid any such implication from the very fact of revealed pseudonymity, the Jameses proffered two things: (1) that their claims would not be for the infliction of emotional distress causing them harms "that relate to pseudonymity, that relate to the fact that the children are hurt or injuries to the children", but would simply be for "battery, medical rape", with the damages "tailored" to meet the court's concern about prejudice to the defendant, and (2) that a jury instruction safely could emphasize that pseudonymity was being allowed only to protect the children, whether or not the parents' claims turned out to have merit. *See* J.A. 292–93. By the first of these, we understand the Jameses to have proffered that they would not claim as items of damage any emotional distress caused them either by shame from public revelation of their victimization or by their awareness of the hurt experienced by the children.

If the district court was actually open to persuasion on the anonymity issue—i.e., was properly in a discretionary rather than an under-no-circumstances decisional mode—we think, with all respect for its judgment, that it critically misapprehended the significance of these proffers. If imposed as conditions to the allowance of pseudonymity—as the

court surely could, holding the Jameses to them at trial—we believe they could effectively relieve the court's expressed concerns about fairness to the defendant.

Under the first proffer, the defendant effectively could cross-examine the Jameses about any aspect of their personal lives put in issue by their evidence—either as to liability or damages. With the fact of pseudonymity known to the jury, we think this would open to defendant every opportunity to impeach the credibility of the Jameses as witnesses that is ordinarily available through revelation of such personal matters as the occupation, place of residence, and the like, of witnesses testifying under their true names. Demeanor is demeanor, however the witness is identified, and it would seem to make no difference to a jury in assessing whether such things as the particular occupation or place of residence of a witness might bear upon his credibility whether the witness bore the name John Smith or Henry Williams.

Under the second proffer, the court could hold the Jameses by order, or by amended pleadings if deemed necessary, to proof only of those harms related to the physical "battery" to which the proffer would limit their claim. Under that proffer—as we think the court is entitled to interpret it—the battery alleged is the physical intrusion involved in the unauthorized inseminations allegedly performed by Jacobson. The actual and consequential damages flowing from any such battery proven are—as limited by the proffer—only such pain and suffering as Mary James might have experienced as a direct result of the battery, and such consequential loss of the plaintiffs' joint right to exercise and control their lawful procreational rights and capacities as may have been caused by it.

On our reading of the record, it seems highly likely that limiting proof of claim and damages, in accordance with the Jameses' proffers, by evidentiary rulings and jury instructions, coupled with general instructions explaining that pseudonymity was allowed only to protect the children without regard to the merits of the claim, effectively could avoid any prejudice to the defendant flowing from the very fact of pseudonymity.

IV

In summary. Federal courts traditionally have recognized that in some cases the general presumption of open trials—including identification of parties and witnesses by their real names—should yield in deference to sufficiently pressing needs for party or witness anonymity. Whether the circumstances warrant anonymity in particular cases is committed in the first instance to trial court discretion, which is then subject to appellate review only for "abuse". This means that there is no legal right in parties either to be allowed anonymity or to avoid it, and that trial courts correspondingly have no unreviewable license either to grant or deny anonymity on general principles, but power only to grant or deny it on the basis of an "informed" discretion. Discretion in this matter is guided, made "informed"—hence constrained—by certain judicially recognized factors that should be taken into account in ruling on anonymity requests. Failure to take relevant factors into account or acting on the basis of legal or factual misapprehensions respecting those factors makes an exercise of discretion not "informed", hence potentially an abuse of discretion.

Here, we have concluded that the district court either failed actually to exercise discretion, ruling instead on the basis of general disapproval of party anonymity at trial, or to have acted on the basis of legal-factual misapprehension as to the factor on which it seemed mainly to rely—prejudice to the defendant. The result—in view of plaintiffs' entirely reasonable position that they will not proceed except under pseudonyms—is effectively to cut off a claim that, if proven, is obviously one of great civil wrong. This obviously should not lightly be done. Here we are sufficiently concerned that in a proper exercise of discretion it possibly should not have been done, that we are constrained to vacate the district court's order as, on our reading of the record, an abuse of discretion.

There then arises the question of the appropriate remand. As to that, we have concluded that, whatever the awkwardness involved, we should vacate the order and remand with directions to reconsider in light of this opinion. That we do so rather than simply imposing our own discretionary judg-

ment, having found the district court's flawed, implies certain things we think should be expressly noted. First, it indicates a perfect confidence in this district court's capacity and willingness to engage in a true reconsideration that accepts and takes into account the specific concerns with the decision under review that are expressed in this opinion. Second, it demonstrates our recognition of the continued superiority of the trial court's vantage point in making this sort of discretionary decision respecting the conduct of trials—whether originally or even following appellate review and correction. And we note in closing that our decision to remand for reconsideration is not to be read on one hand as a prejudgment of the proper exercise of discretion nor, on the other, as a guaranteed affirmance of any reconsidered decision rendered.

*VACATED AND REMANDED FOR RE-CONSIDERATION.*

WILLIAMS, Circuit Judge, concurring in part, dissenting in part:

I write separately only to indicate that I do not believe remand for reconsideration by the district court is necessary given the majority's estimable elucidation of the factors to be considered in an exercise of discretion in this matter. Rather, I believe the risk of substantial harm to these innocent third parties who are minor children so significantly outweighs the minimal risk of prejudice to the defendant—assessed in light of the majority's correct view of the ameliorative effect of plaintiffs' proffers to tailor the damages and to agree to a limiting instruction—that as a matter of law the plaintiffs should be allowed to proceed to trial under the James pseudonyms. Indeed, I can conceive of no situation under which the district court's weighing of these factors on remand, even given the trial court's vantage point in this type of discretionary decision, could lead to a contrary result. Accordingly, I concur in all aspects of the majority's persuasive opinion except Part IV, because I would remand with instructions to allow the requested anonymity.