PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

WESTFIELD INSURANCE COMPANY,
Plaintiff-Appellant,

v.

No. 97-1835

CLARENCE R. HARRIS,
Defendant-Appellee.

WEST VIRGINIA FIRE MARSHAL,
Movant.

Appeal from the United States District Court
for the Southern District of West Virginia, at Huntington.
Joseph Robert Goodwin, District Judge.
(CA-96-370-3)

Argued: October 30, 1997

Decided: January 20, 1998

Before RUSSELL, NIEMEYER, and WILLIAMS, Circuit Judges.

_____

Vacated and remanded by published opinion. Judge Niemeyer wrote
the opinion, in which Judge Russell and Judge Williams joined.

_____

COUNSEL

ARGUED: Brent Karleton Kesner, KESNER, KESNER & BRAM-
BLE, Charleston, West Virginia, for Appellant. William Jack Stevens,
Sr., STEVENS & STEVENS, Hamlin, West Virginia, for Appellee.
ON BRIEF: Renatha S. Garner, KESNER, KESNER & BRAMBLE,
Charleston, West Virginia, for Appellant.

**OPINION**

NIEMEYER, Circuit Judge:

On the evening of January 10, 1996, the house of Clarence Harris in West Hamlin, West Virginia, was destroyed by fire. Harris submitted a claim for payment of the loss to Westfield Insurance Company, which had issued an insurance policy on the house. Believing that the fire was incendiary in nature, Westfield Insurance denied the claim and filed this action for a declaratory judgment that its policy provided no coverage for the loss. Harris filed a crossclaim for the amount of the loss, and a jury awarded Harris $97,500. After the district court added pretrial interest and attorneys fees, it entered judgment in favor of Harris in the amount of $141,674.

In attempting to prove its claim that the fire was deliberately set, Westfield Insurance presented the testimony of the West Virginia Deputy Fire Marshal who gave his opinion that the fire was incendiary. Westfield Insurance also proffered evidence under Federal Rule of Evidence 404(b) that Harris had received payment for six previous claims that houses he owned had been destroyed by fire and a previous claim that his truck had been destroyed by fire. On Harris' motion, the district court struck the fire marshal's entire testimony because it depended too heavily on the findings of a private fire investigator retained by Westfield Insurance. Also on Harris' motion filed before trial, the court refused to permit Westfield Insurance to introduce any evidence of the prior fire claims by Harris.

On appeal, Westfield Insurance challenges these evidentiary rulings, as well as other rulings, including one -- which Harris conceded at oral argument was error -- that the verdict should not be reduced by the amount that Westfield Insurance paid Harris' mortgagor as an innocent insured.

Because we conclude that the district court abused its discretion in excluding Westfield Insurance's critical evidence, we vacate the judgment and remand the case for a new trial.

I

Westfield Insurance issued a policy of insurance to Harris that provided coverage for accidental fire loss or damage to his house in West

2

Hamlin and its contents. The policy, however, excluded coverage for losses "arising out of any act committed: (1) by or at the direction of an insured; and (2) with the intent to cause a loss." It also excluded coverage for an insured who has "engaged in fraudulent conduct relating to this insurance."

Believing the January 10, 1996 fire to be suspicious, Westfield Insurance hired an independent investigation firm to determine the cause and origin of the fire. The investigator assigned to the case concluded that the fire had been deliberately set, based on his findings that: when Harris left his house, at about 9:00 p.m. on January 10, nothing, according to him, was amiss, and he locked all of the doors; three witnesses saw Harris leaving the scene of the fire shortly before 9:25 p.m., just moments before the fire was discovered; the fire developed "very fast"; firemen found the house still secure when they responded to the fire, and the outside gas meter was clicking very rapidly; the fire came from the basement area; and after the fire, the investigator found that the gas range in the basement had been turned on and the nuts securing the connection of two gas lines had been loosened by three turns, allowing gas to escape.

Based on the evidence and conclusion reached by the investigator as well as evidence that there was little furniture in the house and that Harris had a history of at least seven prior fire loss claims, Westfield Insurance turned down Harris' claim for the loss sustained on January 10. It then filed this declaratory judgment action under 28 U.S.C. § 2201.

Before trial, Harris filed a motion in limine to "prohibit the plaintiff from introduction of any evidence of any previous fires which destroyed property owned by the defendant, and to further prohibit any reference to, or any argument based upon the same by the defendant's counsel and witnesses." Westfield Insurance proffered to the court that it would prove that Harris has been involved in at least six prior house-fire claims and one prior truck-fire claim, as follows:

> 1. In December 1979, Harris' dwelling in West Hamlin was destroyed by fire while no one was home. The defendant had homeowner's insurance with the Adkins Insurance Agency at that time.

3

2. On January 1, 1981, Harris' new dwelling, which was located directly across the road from the later dwelling which burned on January 10, 1996, was also destroyed by fire. As with the 1979 fire, no one was home at the time of this fire.

3. On January 29, 1982, the internal area of the house then owned by Harris was damaged by a fire. Once again, no one was at home at the time of the fire. Harris had insured this dwelling with a policy from Art Meadows, an agent for Farmer's Mutual Insurance Company. At the time of the fire, Meadows happened to be driving toward Harris' house and saw Harris drive past him on the road. After Meadows had proceeded down the road for two to three minutes, he observed that Harris' house was on fire. An investigation disclosed that there was very little evidence of furniture in the house and that there was evidence of an accelerant on the floor. That fire was determined to be the product of arson.

4. On February 22, 1983, Harris again experienced a fire and made an insurance claim that was paid by an insurance company.

5. In October 1990, while insured by the Westfield Insurance Company, a small A-frame dwelling on West Hamlin hill owned and insured by Harris was destroyed by fire. Like all of the others, no one was home at the time of the fire. This fire was investigated by the West Virginia State Fire Marshal's Office, which found that the second level contained little or no furnishings, that there was no evidence of the remains of clothing, shoes, bed coverings, or other personal effects in the home, and that no food was in the refrigerator. The investigators also found evidence of a liquid substance running along a beam in the house. They concluded that this fire was of a suspicious nature.

6. On April 15, 1992, Harris reported as stolen his 1990 Chevy S-10 pick-up truck. It was found one to two days

4

later totally destroyed by fire. The insurance company paid Harris over $6,000 for the loss.

7. On December 18, 1993, a house that Harris built on his property in West Hamlin was destroyed by fire. Once again, no one was home when the fire started. Investigators determined that the fire had started in the utility room. The insurance company paid Harris $89,000 for the loss.

Westfield Insurance also proffered expert testimony that one indicator of an arson house fire is that the fire occurs when no one is present at the house.

On the first day of trial, before the presentation of evidence, the district court granted Harris' motion to exclude any evidence of prior fires and instructed counsel not to make any reference to the fires and to instruct their witnesses not to mention the fires. Giving its reason for the ruling, the court explained: "armed robbers committing one armed robbery doesn't mean that they're guilty of the next one. I've done the balancing test under Federal Rules of Evidence 403 and 404 in this case, and I think it's absolutely the clearest kind of case where this evidence ought to be excluded."

During the trial, the West Virginia Deputy Fire Marshal, who investigated the fire on January 10, was called by Westfield Insurance and testified that in his expert opinion the fire was of incendiary origin. After the deputy marshal completed his testimony, Harris moved to strike it because the deputy marshal acknowledged that about 90% of the information on which he based his opinion was obtained from the fire investigator hired by Westfield Insurance. The court granted the motion to strike and instructed the jury not to consider anything that the deputy marshal had said. The court concluded it was too highly prejudicial.

The jury returned a verdict in favor of Harris against Westfield Insurance in the amount of $64,000 for loss of his house, $25,000 for loss of its contents, $3,500 for loss of the house's use, and $5,000 for aggravation and inconvenience. The court added pretrial interest and attorneys fees and entered judgment in favor of Harris in the amount of $141,674. This appeal followed.

5

II

At trial, Westfield Insurance presented the testimony of West Virginia Deputy Fire Marshal E. R. Cook, who gave his opinion that the January 1996 fire was incendiary and that the evidence was sufficient to make out an arson case against Harris. Deputy Cook testified as an expert witness whose job as Deputy Fire Marshal for the State of West Virginia requires him to investigate the cause and origin of fires. He stated that his office receives reports of 600-700 suspicious fires per year and that it investigates 85-90% of them. To give his opinion in this case, Deputy Cook relied on an interview with the West Hamlin Fire Chief, interviews with five firemen who responded to the fire, a videotape of the fire taken by a bystander, a police report that Harris had been seen leaving the scene of a fire shortly before the fire, and the report of the fire investigator retained by Westfield Insurance. The fire investigator's report included numerous photographs, a diagram, the results of some lab work, and findings that the investigator made based on observations and interviews. Deputy Cook said that his opinion was based roughly 90% on what the investigator had discovered from his thorough on-scene investigation. Deputy Cook also indicated that he knew the investigator professionally based upon his investigation of prior fires and considered him to be "very good."

After Deputy Cook completed his testimony, Harris moved to strike it because Cook had based it on "what was fed to him by Westfield Insurance Company." After considering the motion overnight, the district court expressed concern that Deputy Cook's testimony "does nothing other than bolster the credibility of the insurance investigator that will testify." The court noted also that because Cook was a "high official" of the State of West Virginia, "there is every chance that his opinion will be given much credibility by the jury." Because Deputy Cook relied so heavily on what the private fire investigator found, the court ruled:

> Given the extremely prejudicial nature of this testimony and the lack of a factual basis for it and what the court considers to be the improper bolstering of the investigator who will later testify at trial, I am going to strike Mr. Cook's testimony and instruct the jury to disregard it in its entirety over the objection of the plaintiff.

6

Explaining its basis for striking the testimony beyond Deputy Cook's opinion, the court stated,

> The rest of his testimony taken as a whole, beyond that opinion on an opinion, I believe is highly prejudicial. And the prejudicial nature of it substantially outweighs its probative value. The prejudice is unfair. And it will clearly confuse and mislead the jury. And I exclude it under Rule 403.

In short, the district court concluded (1) that it was improper for Deputy Cook to give an opinion based on other expert reports and not on "independent facts," (2) that because he was a public official, his opinion might be given undue "credibility," and (3) that his testimony constituted "improper bolstering of the investigator who will later testify."

While the district court has broad discretion to regulate the admissibility of expert opinion evidence, see General Electric Company v. Joiner, 66 U.S.L.W. 4036, 4037 (U.S. Dec. 15, 1997); United States v. Bostian, 59 F.3d 474, 480 (4th Cir. 1995), in this case we believe that none of the three grounds relied on by the district court is an appropriate reason under the Federal Rules of Evidence to exclude the evidence, and accordingly we conclude that the court abused its discretion. See James v. Jacobson, 6 F.3d 233, 239 (4th Cir. 1993) (discretion abused by failing to apply legally recognized factors constraining its exercise).

Expert opinion may, of course, be received into evidence in the discretion of the district court to assist the jury "to determine a fact in issue." Fed. R. Evid. 702. And the rules expressly authorize that such expert opinions may be based, not only on data and direct observations, but also on the opinions and observations of others "[i]f of the type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703. The Advisory Committee note to Rule 703 explains:

> Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives,

7

> reports and opinions from nurses, technicians and other
> doctors, hospital records, and x-rays.

(Emphasis added).

In this case, it is the Fire Marshal's statutory duty in West Virginia, in connection with preventing fires and suppressing arson, to investigate fires and determine their cause and origin. See W. Va. Code § 29-3-12(f). And in carrying out this duty, the Fire Marshal is authorized to take statements or testimony. See id . § 29-3-12(g). West Virginia also requires insurance companies to report fires to the Fire Marshal and, upon request, to release their investigatory information. See id. §§ 29-3-12(l), 29-3-12a(a). Moreover, if an insurance company believes a fire to be of incendiary origin, it is required by law to report this fact to the Fire Marshal, together with the information it has to support that belief. See id. § 29-3-12a(b). West Virginia law also imposes on the Fire Marshal a duty to give to interested owners or insurers, on request, a report of his investigation. See id. § 29-3-12(l). Thus, it is within the fabric of the State Fire Marshal's official duties to receive and rely on insurance company information about fires within his jurisdiction.

Moreover, in this case, Deputy Cook testified that his office investigates hundreds of fires every year and that it is the "common thing" to obtain information from interested insurance companies. In particular, he testified that he has received and relied upon investigatory reports of fires investigated by Robert Stewart, Westfield Insurance's investigator in this case. Cook stated about Stewart, "He's very good." Deputy Cook said the report that Stewart prepared in this case was complete. Indeed, the report provided patently objective data, such as: (1) on the first floor of Harris' home there was only a recliner and a table lamp; (2) that in the basement of Harris' home there was only a sofa, a television, and a wrench on the washer/dryer; (3) one of the burners on the gas range in the basement was turned on; (4) nuts securing the gas line in the basement had been loosened three turns in two different places so as to allow gas to escape. In addition to these objective findings, Deputy Cook had data from the fire department based on a half-dozen interviews, from the police department, and from independent witnesses, which in the aggregate provided him information that the fire began after 9:00 p.m., the time

8

Harris admitted to being at the house; that Harris was seen leaving the area of his house shortly before the fire was discovered at 9:25 p.m.; that the fire started in the basement area; that the gas meter outside of the house was clicking very rapidly, indicating a large amount of gas was entering the house; and that the house was secure, showing no evidence of a break-in.

The record in this case amply establishes that the reports and data relied on by Deputy Cook are those ordinarily relied on by him in investigating fires, and the fact that the insurance company's investigator also concluded that the fire was incendiary is not a legal reason to exclude the deputy fire marshal's opinion. Cf . General Electric, 66 U.S.L.W. at 4038 (stating that opinion testimony may be excluded if there is "too great an analytical gap between the data and the opinion proffered").

In addition, the fact that the deputy marshal's testimony might be given "much credibility" by the jury or that it might "bolster" a similar opinion that was expected from the insurance company's investigator are not grounds to exclude the evidence. That is not the type of "prejudice" that is envisioned by Federal Rule of Evidence 403. We have held that evidence can be excluded for "prejudice," as used in Rule 403, only when the trial judge believes "that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." Morgan v. Foretich, 846 F.2d 941, 945 (4th Cir. 1988) (internal quotation marks and citations omitted). The insurance company in this case needed the testimony of the deputy marshal regarding the incendiary nature of the fire precisely because both the court and Harris believed that the opinion of the insurance company's investigator could be discounted because he was hired to conduct his investigation by the insurance company.

We conclude that, in relying on the reasons it gave, the district court abused its discretion in striking Deputy Cook's testimony. See James, 6 F.3d at 239.

9

III

Before trial, Harris filed a motion in limine that Westfield Insurance not be permitted to introduce at trial any evidence of Harris' prior fires and claims for losses caused by them. In opposing this motion, Westfield Insurance proffered evidence of at least seven prior suspicious fire claims made by Harris,* which it intended to offer under Federal Rule of Evidence 404(b) to prove absence of mistake or accident. Following a hearing, the court decided to exclude all such evidence and to preclude any reference to it, explaining that, while the evidence was "clearly" relevant, its probative value was substantially outweighed by the danger of "unfair prejudice." "You know, armed robbers committing one armed robbery doesn't mean that they're guilty of the next one." In making its ruling, however, the court failed to explain how, if the evidence was relevant, it was prejudicial in any way other than by being highly probative. In excluding the evidence, we believe that the court misapplied Federal Rules of Evidence 404 and 403 and for this reason abused its discretion in categorically excluding such evidence in this case. See James , 6 F.3d at 239.

We begin with the general proposition that relevant evidence is admissible unless it is excluded for some other purpose authorized by the Federal Rules of Evidence. See Fed. R. Evid. 402. And Federal Rule of Evidence 404(b) provides that prior-acts evidence, when relevant, is admissible unless it is offered to prove "the character of a person in order to show action in conformity therewith." The Rule includes a non-exhaustive list of those purposes for which prior-acts evidence may be admitted: "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b).

All relevant evidence, however, whether offered under Federal Rule of Evidence 402 or Rule 404(b), is subject to exclusion under Federal Rule of Evidence 403 when its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the

_____

*While, based on the proffered evidence, not all of the prior fires were suspicious when looked at individually, several were highly suspicious, and there comes a point when the accumulation of several claims, by itself, creates suspicion.

issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In explaining when "prejudice" may be relied on to exclude evidence, we have said

> [T]he possibly prejudicial effect of evidence can require exclusion only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence.

Morgan, 846 F.2d at 945 (internal quotation marks and citations omitted); see also United States v. Powers, 59 F.3d 1460, 1467 (4th Cir. 1995).

Because of the subtle difference that exists between evidence of character prohibited by Rule 404(b) and evidence of intent or motive, for example, allowed under the same rule, we have articulated a four-prong test for the admissibility of evidence under Rules 404(b) and 403 as follows:

> [W]e hold that evidence of prior acts becomes admissible under Rules 404(b) and 403 if it meets the following criteria: (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes. (2) The act must be necessary in the sense that it is probative of an essential claim or element of the offense. (3) The evidence must be reliable. And (4) The evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the fact-finding process.

United States v. Queen, ___ F.3d ___, No. 96-4085 slip op. at 9-10 (4th Cir. Dec. 29, 1997); see also United States v. Rawle, 845 F.2d

11

1244, 1247 (4th Cir. 1988). It is the first and fourth prongs of that test that are placed at issue in this case.

When considering whether the 1996 fire in this case was incendiary in nature, the issue was squarely presented whether the fire was an accident or whether it was set as part of a plan or scheme by Harris to make fraudulent insurance claims. That Harris made at least seven prior fire claims, several of which were highly suspicious, is probative of whether the fire in this case was accidental. The evidence proffered about the prior fires revealed some striking similarities. Harris owned each of the houses burned, as well as the truck, and stood to benefit from payment of the insurance claims. In virtually every case, the houses were secure and no one was at home when the fires occurred. In various cases, the contents that would normally be expected in a house were missing, such as furniture or food in the refrigerator. In two, an accelerant was found to have been used, and in two, Harris was seen driving away from the scene mere minutes before the fire was discovered.

Prior-acts evidence in this case could be particularly relevant because of the doctrine of chances, recognized by both courts and commentators. That doctrine posits that the more often an accidental or infrequent incident occurs, the more likely it is that its subsequent reoccurrence is not accidental or fortuitous. In Queen, we noted that "[o]nce an act is assumed to be done, `the prior doing of other similar acts . . . is useful as reducing the possibility that the act in question was done within innocent intent. The argument is based purely on the doctrine of chances, and it is the mere repetition of instances . . . that satisfies our logical demand.'" Queen, slip op. at 8 (quoting Wigmore on Evidence § 302, at 245 (Chadbourne rev. 1979) (footnote omitted)). Similarly, where prior acts of apparent coincidence are similar, the repeated reoccurrence of such an act takes on increasing relevance to support the proposition that there is an absence of accident. See Wigmore § 302, at 246 ("Where the intent of an erroneous addition in a bookkeeper's accounts is an issue, . . . several other erroneous additions in the bookkeeper's own favor in the same year and in the same book of accounts go to exclude the explanation of casual error, and leave deliberate intent as the more probable explanation"). "The doctrine of chances and the experience of conduct tell us that accident and inadvertence are rare and casual; so that the reoccurrence of a

12

similar act tends to persuade us that it is not to be explained as inadvertent or accidental." <u>Wigmore</u> § 242, at 45.

The district court seemed to recognize these principles because it found, in passing on the propriety of the prior-acts evidence, that the evidence proffered in this case was "clearly" relevant. Its sole basis for excluding the evidence was that it was "prejudicial" as that term is used in Federal Rule of Evidence 403 as a basis for exclusion.

While Rule 403 authorizes the exclusion of evidence on the ground of prejudice, it does so only when "there is a genuine risk that the emotions of the jury will be excited to irrational behavior" and only then when that risk is disproportionate to the probative value of the evidence. <u>See Morgan</u>, 846 F.2d at 945; <u>Queen</u>, ___ F.3d ___, slip op. at 4. Prejudice under Federal Rule of Evidence 403 is certainly not established from the mere fact that the evidence is highly probative. <u>See Queen</u>, ___ F.3d ___, slip op. at 3-4. Yet, this appears to be the reason underlying the district court's ruling. Indeed, the deputy fire marshal found the prior-acts evidence so probative that he believed the evidence was sufficient to justify bringing an arson indictment against Harris, and he objected to being subpoenaed to testify in this case so as not to prejudice his criminal investigation of Harris.

Because the prior-acts evidence was categorically excluded in this case without being subjected to the necessary examination, a new trial is required.

Accordingly, we vacate the judgment of the district court and remand this case for a new trial. Because we are ordering a new trial, we need not address Westfield Insurance's other assignments of error.

<u>VACATED AND REMANDED</u>

13