T.C. Memo. 2021-113

UNITED STATES TAX COURT

WHISTLEBLOWER 14377-16W, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 14377-16W.                    Filed September 27, 2021.

P filed with the Whistleblower Office (WBO) of the Internal
Revenue Service (IRS) a request for an award under I.R.C. sec.
7623(b)(1), alleging underpayments of tax by a target taxpayer. The
WBO denied P an award on the ground that the IRS had collected no
proceeds on the basis of P's information. P petitioned for review of
the WBO's determination. He also asked to proceed anonymously.
In Whistleblower 14377-16W v. Commissioner, 148 T.C. 510 (2017),
remanded sub nom. In re Sealed Case, 931 F.3d 92 (D.C. Cir. 2019),
we denied P's motion to proceed anonymously, reasoning in part that
disclosing P's identity would allow the public to associate the present
case with other whistleblower claims P has filed and thereby evaluate
the extent to which claims by serial whistleblower filers affect the
work of the Court. The Court of Appeals remanded the case,

_____

[*]This opinion supplements our prior Opinion Whistleblower 14377-16W v.
Commissioner, 148 T.C. 510 (2017), remanded sub nom. In re Sealed Case, 931
F.3d 92 (D.C. Cir. 2019).

concluding that we had abused our discretion by weighing against P's entitlement to anonymity his reliance on public information to file multiple whistleblower claims.  Following remand, R moved for summary judgment that the WBO had not abused its discretion in denying P an award.

Held:  The disposition of a whistleblower's case by granting summary judgment in the Commissioner's favor does not reduce the public's interest in knowing the whistleblower's identity and thereby weigh in favor of granting a request from the whistleblower for anonymity.

Held, further, while prior disclosure of a whistleblower's identity weighs against granting a request to proceed anonymously, the prior protection of the whistleblower's identity is a neutral factor that does not weigh in favor of granting that request.

Held, further, without treating the public's interest in knowing petitioner's identity as enhanced because of his status as a serial whistleblower, he has still not satisfied his burden of providing "a sufficient, fact-specific basis for anonymity", Rule 345(a), Tax Court Rules of Practice and Procedure; consequently, we will again deny P's motion for permission to proceed anonymously.

Held, further, because the administrative record supports R's assertion that the IRS collected no proceeds on the basis of the information P provided and P has not demonstrated sufficient grounds to consider evidence outside the administrative record, R is entitled to summary judgment that the WBO did not abuse its discretion in denying P an award.

[Sealed].

Jonathan D. Tepper, Patricia P. Davis, Kristen H. Joe, and Abigail F. Dunnigan, for respondent.

**[*3]**                    SUPPLEMENTAL MEMORANDUM OPINION

HALPERN, <u>Judge</u>:  Petitioner brought this action under section 7623(b)(4) asking that we review the denial by the Whistleblower Office (WBO) of the Internal Revenue Service (IRS) of his claim for a reward.[1]  When petitioner filed his petition, he also moved under Rule 345(a) for permission to proceed anonymously.  Respondent opposes petitioner's motion.  We initially denied petitioner's motion, for the reasons explained in <u>Whistleblower 14377-16W v. Commissioner</u>, 148 T.C. 510 (2017), <u>remanded sub nom.</u> <u>In re Sealed Case</u>, 931 F.3d 92 (D.C. Cir. 2019).  Petitioner appealed our initial denial of his motion to the Court of Appeals for the District of Columbia Circuit, which concluded that we had abused our discretion by weighing against petitioner's entitlement to anonymity his reliance on public information to file multiple whistleblower claims. In February 2020, we held a hearing to further consider petitioner's Rule 345(a) motion.  Following the hearing, petitioner and respondent submitted briefs addressing petitioner's request for anonymity.  Respondent then moved for

---

[1]All section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.  We use male-gender personal pronouns to refer to petitioner and to the anonymous whistleblowers in the cases we cite for convenience and without intention to identify their actual genders.

[*4] summary judgment that the WBO did not abuse its discretion in denying petitioner's request for an award under section 7623(b)(1). In support of his motion, respondent filed a declaration of Lev Glikman, a senior tax analyst with the WBO. For the reasons explained below, we will grant respondent's motion for summary judgment and, taking into account the instructions provided by the D.C. Circuit in In re Sealed Case, we will again deny petitioner's motion for permission to proceed anonymously.

## Background

### Petitioner's Application for Award

Under a cover letter dated February 12, 2010, petitioner filed a Form 211, Application for Award for Original Information, alleging that the target taxpayer had taken "Improper Tax Positions" in its treatment of (1) "Gift Cards and related 'Breakage'", (2) "FICA Tip Credits", (3) "'asset replacements' and other capital improvements", and (4) like-kind exchanges. Petitioner's wife is named in the Form 211.

### Exam Activities

In a memorandum dated August 9, 2010, from Robert Lew, whom respondent identifies as a "Whistleblower SME [Subject Matter Expert]", to Perry Tuttle, an exam team manager, Mr. Lew listed the issues petitioner raised and

[*5] requested that "the Team * * * examine this claim", to "[d]etermine if the allegations are valid."

In September 2012, the WBO received a Form 11369, Confidential Evaluation Report on Claim for Award, prepared by Revenue Agent Cindy Lensink and approved by her supervisor, Mr. Tuttle. The name of the target taxpayer is redacted on the copy of the form included in the record, but the space provided for "Name of individual whistleblower" gives the names of petitioner and his wife. In response to the question "Did the Service use the information the whistleblower provided to develop specific document requests or other inquiries of the taxpayer?", Ms. Lensink checked the box to respond "Yes". An attachment to the Form 11369 supplements that response as follows:

> Information provided by Informant pertained to the following:
>
> 1/ improper income reporting from gift card sale
> 2/improper threshold for amounts to be capitalized
> 3/ improper classification/presentation of like kind exchange
> 4/ Increase in FICA Tip Credit despite increase in minimum wage (note this item was not considered during examination)
>
> Service utilized information provided to include during examination review of Like Kind exchange item only. Resulting adjustment was net favorable: [redacted] for [redacted] and [redacted] respectively. No additional deficiency was noted due to Like Kind adjustments. [redacted]
>
> Information provided regarding the incorrect reporting of gift card income did not result any adjustment. This item is a large,

[*6]     unusual and questionable item of income that would most probably have been selected for examination. [redacted]

Information provided regarding Capital Expenditures and Improvements--information provided focuses on possible incorrect capitalization due to value of improvement.

[Redacted], the capitalization amount/value was not an issue and no adjustments were made.

On October 2, 2012, Chu Pak, then a WBO analyst, sent an email to Mr. Tuttle that asked: "Are you examining the informant issues on [redacted] and/or do you plan to work on informant issues in those years?" The following day, Ms. Lensink sent an email to Analyst Pak, apparently in response. In the copy of that email included in the record, its principal contents are redacted.[2] Later that month, Analyst Pak sent Mr. Tuttle and Ms. Lensink an email asking for an audit plan and "risk analysis".

WBO's Denial of Award

The record includes a "Claim Action Listing" from "e-trak", which Mr. Glikman describes in his declaration as "respondent's whistleblower case management system". An entry in that listing by Mr. Glikman dated May 19,

---

[2]The email reads: "Hello--[redacted] Let me know if you need further clarification."

[*7] 2015, states: "Analyst reviewed E-trak and determined that there are no collected proceeds as a result of exam."

On March 22, 2016, Mr. Glikman issued a final Award Recommendation Memorandum to Lee D. Martin, the WBO's director. The initial section of that memorandum, captioned "Summary Basis for the Recommendation", reads as follows:

> I am recommending that a final denial letter be issued. There are no related claims. The alleged amount in dispute is over $2M. Alleged issues are non-recognition of gift-card income, overstatement of FICA tip credits, improper expensing of asset replacements and other capital improvements, and improper application of IRC 1031 (like-kind exchanges). The field has audited some of the reported issues, but no adjustments have been made to them. [Redacted]

The following section of Mr. Glikman's final Award Recommendation Memorandum, captioned "Claim Allegation Background and Summary", states: "W/B's submission is based on research of publicly available information. He has filed numerous other claims, all based on publicly available information."

On March 23, 2016, petitioner and his wife called Mr. Glikman to discuss petitioner's claim. In the e-trak entry describing that call, Mr. Glikman wrote: "Analyst tried to explain reason for denial in as much detail as possible. WB and analyst had similar discussions after prior denials. WB does not seem to

[*8] understand Analyst's explanations. He thinks that there are multimillion-dollar adjustments in multiple years that are a direct result of his claim."

In May 2016, the WBO sent petitioner a letter advising him that it had "made a final determination to deny * * * [his] claim for an award." The letter gave as the basis for that denial that "the information * * * [petitioner] provided did not result in any additional tax, penalties, interest or additional amounts."

<u>Petitioner's Motion for Permission To Proceed Anonymously and Supporting Declaration</u>

In the declaration he submitted in support of his motion for permission to proceed anonymously, petitioner claimed to "fear significant economic and social harm from the disclosure of * * * [his] identity". Petitioner referred to "the tax, accounting, and finance professional community" as the "customary source of his livelihood". He asserted in his motion that whistleblowers who provide "tax, accounting, and financial investment advice" are, upon identification, "routinely blacklisted by clients". Thus, petitioner claimed to have "legitimate fear[]" that disclosure of his identity would result in his being "blacklisted from his profession" and cause "severe financial harm to him and his family."

Petitioner argued that his "current age and financial condition required him to "continue his employment for the foreseeable future". He professed to have a "reasonabl[e] fear[]" that revelation of his "whistleblowing activities" would

[*9] "jeopardize his ability to work with current clients or attract and retain new clients". He also raised the possibility that he might "someday find it necessary to seek employment with Non-Compliant Taxpayer or any of its affiliated subsidiaries, only to face retaliation as a whistleblower."

Respondent's Opposition to Petitioner's Motion and Petitioner's Response

Respondent objected to petitioner's motion "because it fail[ed] to set forth a sufficient, fact-specific basis for protecting the confidentiality of petitioner which would override the strong, legitimate interest in allowing the public access to the record in this case." Among other things, respondent asserted "that petitioner's extensive use of the Tax Court to pursue whistleblower claims gleaned not from insider information necessitating the protection of a whistleblower's confidentiality, but from petitioner's examination of publicly available materials * * * obviates the need for petitioner to proceed anonymously."

In the response he filed to respondent's opposition to his motion, petitioner acknowledged that his "primary occupation" is "assisting his spouse in managing and operating" a registered investment advisory firm (RIA). Petitioner admitted that he "had retired from * * * [accounting] activities[,] * * * does not maintain a license as a CPA, and at the time of filing his first IRS WB claim had been 'unaffiliated' for several years."

[*10] Petitioner claimed that disclosure of his identity as a tax whistleblower would "pose[] the specific and immediate risk that the RIA would suffer loss of current and prospective business opportunities." He worried that clients of the RIA might "fear being targeted by governmental agencies through association with a 'Whistleblower'" but admitted that those fears would be "unreasonabl[e]". He alleged that he and his wife "rely on the business for * * * [their] income, financial health and welfare, as well as the financial health and welfare of extended family members." According to petitioner, he and his wife were "of an age where opportunities for alternative employment are remote."

Petitioner explained that the RIA depends on another firm (Firm Y) that serves as custodian for the client assets that the RIA holds under management. Petitioner feared that disclosure of his identity might cause Firm Y to "perceive a conflict with its * * * [other business] activities" and, consequently, terminate its relationship with the RIA. He admitted, however, that any such perception or action would be "arbitrar[]y".

Petitioner described one of his other whistleblower claims--not the one that is the subject of the present case--as involving "by way of family ownership, the Governor of the RIA's state of residence". He expressed fear that "[d]isclosure may elicit harsh and arbitrary retribution by state authorities controlled by the

[*11] governor, including state regulatory authorities". And he worried about "potential defamation or attacks within the community 'elite' which would impact relationships with current and prospective clients."

Petitioner's response also asserted that disclosure of his identity "would have a negative impact on * * * [his] domestic relationship with * * * [his] spouse, posing a threat to * * * [their] domestic circumstances".

February 2020 Hearing

Potential Physical Harm From Disclosure

When asked by the Court at the February 2020 hearing whether he had "any fear of physical harm from anyone were * * * [his] name to become public", petitioner responded: "[I]n general, that's probably not a direction I want to go in because I'm not sure any fears I have meet the legal standard of what would normally be acceptable." He referred to a case other than the one before us in which he had reported to two Government agencies alleged violations by a company of which an individual we will refer to as "Mr. X" was a principal. Petitioner said Mr. X was serving time in a Federal penitentiary "with regard to issues that * * * [petitioner had] brought to the attention" of the relevant authorities. He alluded to claims that Mr. X and "some of his associates" had been "involved in a certain number of homicides."

[*12] Petitioner acknowledged that Mr. X "never made a specific threat" to him. He also admitted that he did not know whether Mr. X was aware of petitioner's involvement in the proceedings that led to Mr. X's incarceration. When asked by the Court how he would face a threat of physical harm from Mr. X, petitioner responded: "I don't pretend to have all the answers there, but in the underlying case here, I was identified as a serial whistleblower et cetera, et cetera. So it certainly would be possible for him to go, I recognize that name. I thought that SOB, blank, blank, blank. I'm going to whack that guy." Petitioner estimated the probability of Mr. X's connecting the two cases as "between 2 and 20 percent". Although petitioner denied that his estimate was "simply speculation", he did not identify any "objective data" on which he based that estimate.

When asked by the Court at the February 2020 hearing whether she feared physical harm from the targets of her husband's complaints were his identity to be disclosed, petitioner's wife responded that she did not.

Potential Harm to Marriage and Social Relationships

In the declaration of petitioner's wife that we accepted at the February 2020 hearing, she predicted: "Based upon my and petitioner's experience in our community, disclosure of Petitioner's role in reporting to the I.R.S. tax underpayments by large or small companies will likely create erroneous

[*13] impressions, negative and even hostile reactions amongst various individuals, clients, prospects, competitors, social and community relationships we have developed over the years." In her oral testimony at the hearing, petitioner's wife testified that, if her husband's identity were disclosed, "[t]here are people that would think less of * * * [her], less of * * * [her husband]."

In petitioner's own testimony at the hearing, he referred to a neighbor whom he considered to be "a pretty close personal friend". "[I]f he heard the word whistleblower," petitioner predicted, "I'm probably not going to be invited over for cocktails anymore."

Petitioner claimed that "anybody who has social * * * relationships * * * would have a justifiable fear that those relationships would suffer if they were identified as an IRS whistleblower". He admitted that his own fears in that regard were not attributable to "anything in particular to * * * [him]." He feared only the same "generalized" harm that anybody who is a whistleblower would suffer".

Petitioner's wife agreed with the Court's suggestion that, among the harms she feared from disclosure of her husband's identity was fear that she "would suffer personal harm in * * * her relationship to * * * [petitioner] because * * * the various stresses that attend * * * [their] marriage * * * would increase" with disclosure. Petitioner himself testified: "[T]he attack on my anonymity has

**[*14]** created a tremendous amount of stress. It has contributed to the deterioration of the marriage." Those circumstances, he said, explained why he and his wife live in different States.

Potential Economic Harm

During cross-examination at the February 2020 hearing, respondent's counsel asked petitioner about a business in his name listed on a curriculum vitae he had provided. When asked how much time he spent consulting for that business, petitioner admitted that "the only activities I have had over the past decades have involved the whistleblower filings." He acknowledged that his consulting business had no clients, saying: "I haven't been involved in any outside consulting for quite some time."

When we asked petitioner's wife whether concerns of the RIA's clients about her husband's whistleblower activities would be "justifiable", she responded that they would not but added that clients "have unjustifiable concerns about a lot of things." "People get really pretty funny with their money," she said, "in terms of what they worry about." She claimed that her "business is 100% reliant on * * * [her] reputation as a trustworthy advisor" and professed pride in her and her husband's having developed a reputation for "honesty and integrity in our dealings with our clients".

[*15] Petitioner's wife also suggested that, upon learning of her husband's whistleblowing activities, her clients might wonder if she and her husband were "being audited by the IRS." But she admitted that any speculation along those lines "certainly wouldn't be justifiable."

Petitioner's wife speculated that disclosure of her husband's identity might cause Firm Y "to distance itself from any controversy or perceived controversy related to 'Whistleblowers'--particularly Whistleblowers who have been branded as 'Serial Whistleblowers' by the Tax Court." Firm Y, she suggested, might also want to avoid conflicts of interest with current or potential clients who are targets of her husband's whistleblower activities.[3]

Petitioner himself testified that he and his wife "expect and feel like we deserve complete trust from our clients". He professed concern at the prospect that Firm Y and clients of the RIA "would not want to do business with a firm that had a whistleblower employed by it". When asked by the Court whether they would have "a legitimate suspicion that * * * [he] might turn them in", petitioner responded:

---

[3]Petitioner's wife, referring to Firm Y, stated: "Numerous of the Named Taxpayers associated with * * * [her husband's] filings are customers or prospective customers of our affiliate."

[*16] Well, I think the process raises questions. And so semantically, that's a very difficult question. It is a legitimate question for them to have. I mean, the client is the boss. Any question a client has is legitimate, and we need to deal with it. We, I think, are calling it illegitimate only because we would never violate that faith. Well, that doesn't do any good if the client leaves. So I think the issue of whether it's a legitimate concern or illegitimate is very much a question of semantics.

Petitioner's wife explained in her written declaration that, wholly apart from the identification of petitioner as a tax whistleblower, the RIA is at risk of being terminated by Firm Y because the value of client assets the RIA manages no longer meets the minimum threshold Firm Y requires. She described an investment advisory firm's relationship with the custodian of its clients' assets as its "most important * * * business relationship". She expressed concern that "obtain[ing] a new custodian/affiliate * * * might not be possible." At the very least, her clients would have to execute new paperwork with any new custodian--a prospect she described as "an administrative nightmare". She characterized the market for investment advisory services as "highly competitive" and worried that the "unmasking" of her husband, and her association with him, would be "taken advantage of by competitors within * * * [their] industry."

At least at the time of her declaration, petitioner's wife was apparently under consideration for appointment to a seat on a State board that oversees assets held in pension funds. She suggested that, were her husband's identity as a whistleblower

**[*17]** disclosed and one of the other candidates for the State board selected, she would wonder, because of the Governor's association with the target in another of her husband's whistleblower filings, "if it was the unmasking that doomed my appointment." Petitioner's wife referred to the filing in regard to the target with which the Governor was associated as "one of our claims". Petitioner also referred to that matter as "one of our claims", and testified that his wife "believes in the filings, [and has] been very supportive of the tremendous amount of expert [sic] that's been expended or effort."

Petitioner's wife also intimated that disclosure of her husband's identity as a tax whistleblower might "prejudice" State "regulatory authorities" that oversee the RIA. She opined that "regulatory authorities have the power to make your life miserable or put you out of business."

Discussion

I.    Petitioner's Motion for Permission To Proceed Anonymously

    A.    Applicable Standards

Section 7623(b)(1) requires the payment of an award to an individual (commonly referred to as a "whistleblower") who provides information concerning underpayments of tax if the Commissioner, on the basis of that information, "proceeds with any administrative or judicial action" that results in the collection

**[\*18]** of proceeds. Section 7623(b)(4) allows whistleblowers to appeal award determinations (including determinations not to grant an award) and gives this Court jurisdiction over those appeals.

Rule 345(a) provides in relevant part: "A petitioner in a whistleblower action may move the Court for permission to proceed anonymously, if appropriate. Unless otherwise permitted by the Court, a petitioner seeking to proceed anonymously pursuant to this Rule shall file with the petition a motion, with or without supporting affidavits or declarations, setting forth a sufficient, fact-specific basis for anonymity."

As we explained in Whistleblower 14377-16W v. Commissioner, 148 T.C. at 515: "We will permit a whistleblower to proceed anonymously if the whistleblower presents a sufficient showing of potential harm that outweighs counterbalancing societal interests". In Whistleblower 14106-10W v. Commissioner, 137 T.C. 183, 205 (2011), we recognized that "[t]he social interests at stake [in a whistleblower case] are mixed." "On the one hand," we explained, "there is a strong social interest in protecting * * * [a whistleblower's] identity as a confidential informant." Id. "On the other hand," we acknowledged, "the people generally have a right to know 'who is using their courts'." Id. (quoting Doe v. Blue Cross & Blue Shield United of Wis., 112 F.3d 869, 872 (7th Cir. 1997)).

[*19] B.    Initial Denial of Motion and Remand

In our prior Opinion denying petitioner's Rule 345(a) motion, we compared his case to prior cases in which we had granted requests for anonymity and observed that "petitioner [had] ma[de] no plausible claim that he was (or may be) threatened physically." Whistleblower 14377-16W v. Commissioner, 148 T.C. at 517. Nor did petitioner claim an employment relationship that would be threatened by disclosure of his identity. "And petitioner is at no risk", we observed, "of the loss of employment-related benefits, such as retirement benefits." Id. In contrast to whistleblowers granted anonymity, petitioner did not "identif[y] a taxpayer who, upon learning * * * [his] identity, would have the power to, and might be expected to, act against him." Id. "And while * * * we accept that petitioner may suffer some embarrassment or annoyance from our denying the motion," we wrote, "his fears of marital discord, the alienation of unnamed business partners, and retribution from unnamed political figures are speculative". Id. Therefore, we concluded, "petitioner ha[d] not provided us with a sufficient 'fact-specific' justification for permission to proceed anonymously." Id.

Notwithstanding our weighing of the potential harm from disclosure against the countervailing public interests, we volunteered that, "given the early stage of this case, we might [have] otherwise be[en] inclined to weigh the people's interest

**[\*20]** in knowing who is using the courts as so weak as to give petitioner the benefit of the doubt, at least temporarily." Id. We declined to do so, however, because petitioner "is an unusual claimant to our whistleblower jurisdiction", having brought numerous cases before the Court and the WBO in which his allegations of tax underpayments relied solely on information available to the public, such as published financial reports. Id. "Unless we identify serial filers by name," we reasoned, "the public will be unable to judge accurately the extent to which the serial filer phenomenon has affected the work of the Tax Court because the public would not know whether any particular petitioner of an adverse whistleblower determination had filed petitions appealing other adverse whistleblower determinations." Id. at 518-519.

The Court of Appeals rejected the premise that disclosing petitioner's identity would be "necessary to enable the public to gauge (1) the extent to which serial filers affect the work of the Tax Court or (2) whether any particular petitioner is a serial filer." In re Sealed Case, 931 F.3d at 93. The court suggested that those purposes could be adequately served merely by giving each filer "a unique pseudonym". Id. at 98. Having found that we had abused our discretion by denying petitioner's motion to proceed anonymously by weighing against him his status as a serial filer of whistleblower claims made on the basis of public

**[\*21]** information, the appellate court remanded the case to allow us "to determine anew whether * * * [petitioner] has satisfied his burden under Rule 345(a) to set forth a 'sufficient, fact-specific basis for anonymity.'" Id. at 99.

In James v. Jacobson, 6 F.3d 233, 238 (4th Cir. 1993), the Court of Appeals for the Fourth Circuit noted that prior caselaw had identified factors for trial courts to consider in evaluating requests for anonymity. The court listed five of those factors that, in its view, "ha[d] relevance" to the case before it:

> whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature; whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; the ages of the persons whose privacy interests are sought to be protected; whether the action is against a governmental or private party; and, relatedly, the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

Id. In In re Sealed Case, 931 F.3d at 97, the D.C. Circuit opined that the five James factors "serve well as guideposts from which a court ought to begin its analysis" but cautioned trial courts not to "engage in a wooden exercise of ticking the five boxes."

C.     Reconsideration of Petitioner's Motion

For the reasons explained below, taking into account the testimony presented at the February 2020 hearing, we conclude that, without treating the public's

**[*22]** interest in knowing petitioner's identity as enhanced because of his status as a serial whistleblower, petitioner still has not satisfied his burden of proving "a sufficient, fact-specific basis for anonymity." Rule 345(a).

As noted above, in our initial Opinion in the case, we concluded that "petitioner ha[d] not provided us with a sufficient 'fact-specific' justification for permission to proceed anonymously." Whistleblower 14377-16W v. Commissioner, 148 T.C. at 517. In other words, we judged that, if the public's interest in knowing petitioner's identity were given its normal weight, the showing of potential harm from disclosure that petitioner had made would not have entitled him to anonymity. Nothing in the Court of Appeals' opinion remanding the case calls that judgment into question. But we identified two respects in which the public's interest might have differed from that in a normal case. First, we accepted the possibility that the public's interest in knowing a whistleblower's identity is less in the early stages of a case than it will become later. Id. ("[G]iven the early stage of this case, we might otherwise be inclined to weigh the people's interest in knowing who is using the courts as so weak as to give petitioner the benefit of the doubt, at least temporarily."). But we viewed petitioner's status as a serial filer of whistleblower claims based on publicly available information as cutting in the other direction, increasing the public's interest in petitioner's identity. Given that

**[*23]** view, we had no reason to decide whether the public's interest in knowing a whistleblower's identity is, all else being equal, less in the early stages of a case. To the extent the case's procedural posture may have reduced the public's interest in petitioner's identity, that factor was at least offset, in our view, by factors unique to petitioner. We therefore concluded that the grounds petitioner had advanced for anonymity were insufficient to meet his burden under Rule 345(a)--the same result we would have reached had we given the public's interest in petitioner's identity its normal weight.

In the light of the instructions the appellate court provided on remand, we can no longer treat the public's interest in knowing petitioner's identity as enhanced because of his status as a serial filer of whistleblower claims. On remand, our disposition of petitioner's motion for permission to proceed anonymously turns on two questions. The first of those questions is the one we had no need to answer definitively in our initial Opinion--that is, whether, because of the case's procedural posture, the public's interest in petitioner's identity is atypically weak. The second question we face is whether, in the postremand proceedings, petitioner made a stronger case for the potential harm that he or his wife could suffer from disclosure of his identity. Because we find that the answer to both questions is "no", it follows from our initial Opinion that we must adhere to

**[*24]** our original judgment that petitioner has not provided sufficient justification for proceeding anonymously. The case's procedural posture--in particular, our disposition of the case on the merits on respondent's motion for summary judgment--does not require us to give less weight than usual to the public's interest in knowing petitioner's identity. Because the case petitioner made for anonymity before remand was insufficient to offset the public's normal interest in knowing who is using the courts, and because petitioner has not materially improved his case in the post-remand proceedings, we again judge his case as inadequate to allow him to proceed anonymously under Rule 345(a).

### 1. Public's Interest in Disclosure of Petitioner's Identity

Our suggestion in Whistleblower 14377-16W v. Commissioner, 148 T.C. at 517, that the public's interest in knowing a whistleblower's identity might be weaker in the early stages of a case traces back to our Opinion in Whistleblower 14106-10W. In that case, the Commissioner had established that no administrative or judicial action against the target taxpayer had been commenced on the basis of the information the whistleblower had provided and, thus, no proceeds had been collected. Consequently, following Cooper v. Commissioner, 136 T.C. 597 (2011), we granted the Commissioner's motion for summary judgment. We then turned to a motion filed by the whistleblower for permission to proceed

[*25] anonymously.  We found that "[t]he record reasonably support[ed] the

conclusion that disclosing * * * [the whistleblower's] identity could adversely

affect not merely * * * [his] current employment but also * * * [his] future

employability."  Whistleblower 14106-10W v. Commissioner, 137 T.C. at 203.

We concluded that the whistleblower had "demonstrated a risk of harm that far

exceed[ed] in severity mere embarrassment or annoyance."  Id. at 204; see also

James, 6 F.3d at 238 (suggesting that an effort "merely to avoid the annoyance and

criticism that may attend any litigation" is not a sufficient justification for

anonymity).  The whistleblower before us in Whistleblower 14106-10W v.

Commissioner, 137 T.C. at 204, "reasonably fear[ed]" "retaliation, professional

ostracism, and economic duress".  Thus, we might well have concluded that the

potential harm to the whistleblower from disclosing his identity would have

outweighed the public's interest in knowing his identity even if the public's

interest were given its normal weight.[4]  Going further, we added:  "Because we

---

[4]In Whistleblower 7208-17W v. Commissioner, T.C. Memo. 2018-118, we
distinguished the case of the whistleblower before us from the one in
Whistleblower 14106-10W v. Commissioner, 137 T.C. 183 (2011).  To begin with,
we noted, we were not considering "a motion for summary judgment or other
dispositive motion."  Whistleblower 7208-17W v. Commissioner, T.C. Memo.
2018-118, at *32.  But we viewed as a "[m]ore important[]" distinction that we had

**[\*26]** have held that \* \* \* [the Commissioner] is entitled to summary judgment on a threshold legal issue which does not depend to any appreciable extent on \* \* \* [the whistleblower's] identity, we believe the public's interest in knowing \* \* \* [his] identity is relatively weak." Id. at 205.

Our Opinion in Whistleblower 14106-10W should not be understood to mean that any whistleblower who loses on summary judgment is entitled to anonymity. In suggesting that our disposition of the case on the merits reduced the public's interest in knowing the whistleblower's identity, we relied on prior caselaw that reflected the influence of a paper by Joan Steinman. In her paper, "Public Trial, Pseudonymous Parties: When Should Litigants Be Permitted to Keep Their Identities Confidential?", 37 Hastings L.J. 1 (1985), Professor Steinman listed various factors that courts should consider in balancing a litigant's interest in anonymity against the public's interest in knowing the litigant's identity. She divided her factors into two categories: those favoring confidentiality and those favoring disclosure. The fifth factor on the "favoring confidentiality" list is "whether, because of the purely legal nature of the issues presented, or otherwise,

---

found, in Whistleblower 14106-10W, "that the whistleblower had sufficiently demonstrated a risk of harm severe enough to justify granting the whistleblower anonymity." Id. at \*33.

**[\*27]** <u>there is an atypically weak public interest in knowing the litigants'</u>

<u>identities</u>." <u>Id.</u> at 41. Professor Steinman illustrated that factor by referring to

cases in which women requesting anonymity challenge the constitutionality of a

statute regulating or restricting abortions. As Professor Steinman explained, "the

public interest in access to these litigants' names is atypically weak because they

sue as fungible members of a class, whether or not the suit technically is framed as

a class action." <u>Id.</u> at 46-47. In those cases, the relevant question is not whether

the particular litigant, given her individual circumstances, is entitled to pursue an

abortion but instead whether all of the many women similarly situated are so

entitled. The challenge could have been brought by any one of those women. That

the case was brought by the particular plaintiff before the court is of relatively little

moment.

Among the cases we cited in <u>Whistleblower 14106-10W v. Commissioner</u>

for the proposition that our disposition of the case on the merits rendered

"relatively weak" the public's interest in knowing the whistleblower's identity

were <u>Doe v. Hartz</u>, 52 F. Supp. 2d 1027 (N.D. Iowa 1999), <u>Doe v. Del Rio</u>, 241

F.R.D. 154 (S.D.N.Y. 2006), <u>Lozano v. City of Hazleton</u>, 496 F. Supp. 2d 477

(M.D. Pa. 2007), <u>vacated and remanded on other grounds</u>, 563 U.S. 1030 (2011),

and <u>Sealed Plaintiff v. Sealed Defendant</u>, 537 F.3d 185 (2d Cir. 2008). In each of

[*28] those cases, the court included Professor Steinman's "purely legal issue" factor on a list of factors relevant in considering a request for anonymity, although none of the courts acknowledged its debt by citing her paper.  See Sealed Plaintiff, 537 F.3d at 190; Lozano, 496 F. Supp. 2d at 506; Del Rio, 241 F.R.D. at 157; Hartz, 52 F. Supp. 2d at 1046-1047.  The District Court for the Southern District of New York in Del Rio, 241 F.R.D. at 158, however, demonstrated that it understood the thinking behind the factor when it wrote:  "[W]here a lawsuit is brought solely against the government and seeks to raise an abstract question of law that affects many similarly situated individuals, the identities of the particular parties bringing the suit may be largely irrelevant to the public concern with the nature of the process."  The court even singled out Professor Steinman's example of abortion rights litigation, observing that "[t]he particular identity of Roe in Roe v. Wade has little bearing on the nature of the dispute or the merits of the case."  Id.  Therefore, tracing the purely legal interest factor back to its origin in Professor Steinman's paper demonstrates that what mattered in Whistleblower 14106-10W v. Commissioner, 137 T.C. at 205, was not that we resolved the case by granting a motion for summary judgment in the Commissioner's favor but that our decision rested on a legal issue whose resolution we viewed as not dependent "to any appreciable extent on * * * [the whistleblower's] identity".

**[\*29]** As explained <u>infra</u> part II, in the present case, respondent's entitlement to summary judgment does not depend on our resolution of an abstract legal issue common to many similarly situated whistleblowers. Instead, we will grant respondent's motion for summary judgment because the specific administrative record before us supports the WBO's conclusion that petitioner is not entitled to an award because no net proceeds were collected as a result of the actions initiated on the basis of the specific information petitioner provided.

Petitioner makes no argument that the public's interest in knowing his identity is atypically weak. Nor do we see any grounds for an argument to that effect. In particular, we find no basis in the law for the proposition that the public has only a weak interest in the identity of a whistleblower whose case is disposed of on summary judgment.[5]

Because we have no grounds for treating the public's interest in knowing petitioner's identity as atypically weak, and because we concluded in our prior Opinion in the case that petitioner had not made a sufficient showing of potential harm from disclosure to offset the public's interest in his identity were we to give

---

[5]Moreover, as explained <u>infra</u> part II.A, the Commissioner's filing of a motion for summary judgment in a tax whistleblower case may have little effect on the nature of the proceedings because of the scope and standard of our review.

[*30] that interest its normal weight, it follows that we must again deny petitioner's motion unless the showing of potential harm he made in the post-remand proceedings materially exceeded the showing he had made before our initial denial of his motion. For the reasons explained below, what we have learned from the February 2020 hearing and petitioner's subsequent brief does not convince us that the potential harm from disclosure of petitioner's identity is materially greater than we had judged it to be in our prior Opinion.

2.      Potential Harm From Disclosure

a.      Retaliatory Physical Harm

One of the factors we consider in evaluating a whistleblower's request for anonymity is "whether identification poses a risk of retaliatory physical * * * harm to the * * * [whistleblower] or even more critically, to innocent non-parties". James, 6 F.3d at 238. In our initial Opinion, we observed that, unlike whistleblowers granted anonymity in other cases, "petitioner [had] ma[de] no plausible claim that he was (or may be) threatened physically." Whistleblower 14377-16W v. Commissioner, 148 T.C. at 517. In our judgment, that remains true.

We judge as quite unlikely the prospect that, were petitioner's identity in the case before us to be disclosed, Mr. X would, upon release from prison, seek to physically harm petitioner. Petitioner had difficulty explaining at the February

[*31] 2020 hearing how Mr. X would draw the necessary connection between this case and the proceedings that led to Mr. X's incarceration. For petitioner to suffer retaliatory physical violence from him, Mr. X would first have to learn of petitioner's identity in this case--one in which he is not involved. And he would need to recognize petitioner's name and recall (if, indeed, he ever knew) that petitioner had made inquiries into his company. Then Mr. X would need to surmise, perhaps on the basis of our description of petitioner in our initial opinion as a serial filer of whistleblower claims, that petitioner had a role in Mr. X's prosecution. And Mr. X would have to believe--again, on the basis of mere surmise--that petitioner bore sufficient responsibility for his own prosecution to warrant violent retribution.[6] In our judgment, any fear petitioner might have of physical harm from Mr. X as a result of disclosure of petitioner's identity is not a "sufficient, fact-specific basis for anonymity." Rule 345(a). And petitioner's wife admitted at the February 2020 hearing that she did not fear physical harm from the targets of her husband's complaints were his identity to be disclosed.

---

[6]Petitioner failed to establish even that Mr. X is prone to violence. He offered no substantiation of his assertion that Mr. X and associates had been involved in homicides.

**[*32]**                    b.        Harm to Marriage and Social Relationships

The potential harm to a whistleblower that we consider in evaluating a request to proceed anonymously is not limited to physical harm. We have also taken into account the risk of "social * * * stigma". Whistleblower 11332-13W v. Commissioner, T.C. Memo. 2014-92, at *11-*12.

Petitioner and his wife offered very little fact-based support for their concerns that disclosure of petitioner's identity would impact their social relationships. Petitioner's wife said her concerns were grounded in her "experience in * * * [her] community", but she gave no examples of past behavior of members of that community to legitimize those concerns. Similarly, petitioner offered no specific basis for his concern about the possible reaction of his friend and neighbor upon learning of petitioner's whistleblowing activities. Petitioner admitted that his concerns are rooted primarily in his sense of how whistleblowers are generally treated rather than based on factors unique to his own situation.

Petitioner seems to believe that the stigma attached to whistleblowers is so pervasive that he need not justify his concerns. But he cites no authority for his claim that courts simply accept that the social stigma any whistleblower would face upon identification justifies the whistleblower's anonymity, regardless of his or her particular circumstances.

[*33]  In Whistleblower 7208-17W v. Commissioner, T.C. Memo. 2018-118, at *24, we responded to a whistleblower's assertion that "whistleblowers are generally perceived negatively, ostracized, and retaliated against."  We acknowledged that those "observations regarding general perceptions about whistleblowers may be valid" but emphasized that each whistleblower's "request to proceed anonymously stands upon its own."  Id. at *25.  Rule 345(a) requires each whistleblower seeking anonymity to "set[] forth a sufficient, fact-specific basis for anonymity."  Whistleblowers are not entitled to anonymity as a matter of course because, as petitioner would have it, everyone knows that an identified whistleblower would face significant social stigma.

In our prior Opinion, we characterized petitioner's "fears of marital discord" as "speculative".  Whistleblower 14377-16W v. Commissioner, 148 T.C. at 517.  In the proceedings following remand of the case, both petitioner and his wife candidly acknowledged that their relationship is already stressful.  Neither of them, however, provided specific grounds for their concern that disclosure of petitioner's identity would exacerbate the tensions in their relationship.  For example, petitioner's wife agreed with the Court's suggestion that disclosure would increase stress in her marriage but did not provide further detail about how her relationship with her husband would be harmed.

[*34] Whether disclosure of petitioner's identity would increase the existing difficulties he and his wife face in their relationship most likely depends on the effects disclosure would have outside their marriage. If disclosure has adverse consequences to the RIA or on the couple's outside social relationships, she might hold him responsible and he might suffer feelings of guilt. Conversely, if disclosure of petitioner's identity does not cause significant harms outside their marriage, it is difficult to see why it would add to the friction within their marriage. In short, the factor of potential harm to the couple's marital relationship from disclosure seems to be derivative of the other factors.

c.      Economic Harm

In evaluating a tax whistleblower's request for anonymity, we have also taken into account the risk of "professional stigma and economic duress" that disclosure of the whistleblower's identity would pose. Whistleblower 11332-13W v. Commissioner, at *12. As described above, while petitioner claimed in his initial motion and supporting declaration that he feared that disclosure of his identity would result in his being "blacklisted from his profession", subsequent filings and proceedings have demonstrated that he has no business activities of his own that might be adversely affected by disclosure of his identity as a whistleblower. Instead, the crux of petitioner's case for anonymity, as we

**[\*35]** understand it, is that disclosure of his identity would adversely affect the business of his wife's RIA firm.

Again, in our prior Opinion, we characterized as "speculative" petitioner's "fears of \* \* \* the alienation of unnamed business partners, and retribution from unnamed political figures". <u>Whistleblower 14377-16W v. Commissioner</u>, 148 T.C. at 517. In the proceedings following remand, petitioner and his wife provided further explanation of why they fear that disclosure of his identity would threaten the business of the RIA. In particular, they disclosed the identities of Firm Y and the Governor from whom they fear retribution. But knowing the specific identities of that firm and that political leader does not add appreciably to the credibility of their concerns.

The details we have learned in the post-remand proceedings about the concerns of petitioner and his wife regarding the effects that disclosure of his identity as a whistleblower would have on the RIA do not cause us to view them as any less speculative than we did before. Petitioner's wife admitted that clients and prospective clients of the RIA would have no rational grounds to assess the firm less favorably because of her husband's involvement in whistleblower claims. By itself, that admission does not make her own concerns irrational. One can rationally fear irrational action by another. Engagement in retaliatory physical

**[*36]** violence by the target of a whistleblower claim would hardly be considered rational, but we have accepted that a whistleblower can rationally fear that prospect. To justify a request for anonymity, however, a whistleblower must have specific grounds to fear retaliatory behavior. And the less rational that behavior, the higher the burden should be to justify fear of it.

Neither petitioner nor his wife offered specific grounds for concern that current or potential clients of the RIA would irrationally consider petitioner's whistleblowing activities as an adverse factor in evaluating the firm's suitability as an investment adviser. The testimony of petitioner's wife suggests that she does not reciprocate the trust she seeks from her clients. She professes fear that enough current and potential clients would make "funny" decisions on the basis of irrational prejudice to materially impact the RIA. If the testimony of petitioner and his wife is to be believed, they essentially ask us to be complicit in their withholding from current and potential clients of the RIA facts that might affect the clients' willingness to trust their investment funds to the firm.

It is also possible, however, that petitioner and his wife <u>do</u> trust that their clients, if properly informed about the nature of his whistleblowing activities, would not treat his involvement in those activities as an adverse factor in deciding whether to continue their relationship with the RIA. They may simply want to

**[*37]** avoid the annoyance of explaining what his activities do and do not mean, answering clients' questions, and providing reassurance that those activities raise no legitimate concerns. That prospect, however, would not justify granting petitioner's request for anonymity. See James, 6 F.3d at 238.

What we have learned in the post-remand proceedings about the relationship between the RIA and Firm Y does not add appreciably to petitioner's justification for anonymity. Simply knowing the name of the firm, as we do now, does not add to the credibility of the concern that Firm Y might terminate its relationship with the RIA. If petitioner has indeed filed whistleblower claims asserting underpayments of tax by companies with which Firm Y has, or is seeking, relationships, we can understand how Firm Y's learning of those claims might cause it to look unfavorably on petitioner and his wife. But disclosure of petitioner's identity in the case before us need not lead to Firm Y learning the identities of the target taxpayers in all of petitioner's whistleblower claims. We do not even accept as a foregone conclusion that our denial of petitioner's Rule 345(a) motion would cause Firm Y to learn of petitioner's having brought this case, much less that other whistleblower claims he has filed might involve companies with which Firm Y provides, or would like to provide, financial services. The identity of the target taxpayer in this and petitioner's other cases would remain confidential

**[\*38]** notwithstanding our denial of petitioner's motion for permission to proceed anonymously in this case. Those taxpayers, including any that may be current or prospective clients of Firm Y, would have no apparent way of identifying themselves as the targets.[7] And if the targets are unable to identify themselves and, as a consequence, complain to Firm Y, Firm Y would seem to have no grounds for concern that petitioner's whistleblowing activities would adversely affect Firm Y's other business activities. Moreover, Firm Y already has an objective basis for terminating its relationship with the RIA, yet it has not done so. Firm Y presumably finds the relationship sufficiently profitable to continue it. If so, we judge it unlikely that Firm Y would terminate its relationship with the RIA merely because petitioner has filed tax whistleblower claims that might involve taxpayers with whom Firm Y does or seeks to do business. Again, disclosure of petitioner's identity in this case would not affect the anonymity of the target taxpayer in this or any other case.

---

[7]In that respect, the situation of a whistleblower who relies solely on public information can be meaningfully distinguished from one who has an employment or other "insider" relationship with the target taxpayer. The disclosure of an inside whistleblower's name would give a target reason to surmise that it is the subject of the claim. By contrast, we have no reason to believe that petitioner's name would have any meaning to the target in the present case (or, for that matter, the targets in any of his other cases).

[*39] Finally, petitioner has not adequately established that losing Firm Y as custodian of the assets the RIA holds under management would have a significant adverse impact on the RIA's business. Would not other, perhaps smaller, custodial firms be willing to step in? How do other financial advisory firms similar in size to the RIA manage? Petitioner's wife did not substantiate her concern that "obtain[ing] a new custodian/affiliate * * * might not be possible." We accept that substituting a new custodian for Firm Y would require the execution of new paperwork. But whatever administrative burden that would involve should not cause otherwise satisfied clients to take their money elsewhere. After all, moving an account to another investment adviser would also require the execution of new paperwork.

We find no merit in the claims that disclosure of petitioner's identity in the case before us would lead to punitive action directed by the Governor of the State where the RIA resides. Again, identifying petitioner as the whistleblower in the present case would not identify the target taxpayer in this or any other case.

In short, taking into account what we have learned in the post-remand proceedings, we remain convinced that the concerns about the impact on the RIA of disclosure of petitioner's identity as the filer of the claim in this case are too speculative to serve as a sufficient justification for maintaining petitioner's

[*40] anonymity. Because petitioner has not provided significantly greater justification for anonymity following remand of the case than he had in the proceedings before our initial Opinion, it follows from that Opinion that petitioner has not established that the "potential harm" from disclosure of his identity "outweighs [the] counterbalancing societal interests in knowing * * * [his] identity." Whistleblower 14377-16W v. Commissioner, 148 T.C. at 515.

3.  Petitioner's Legal Arguments

Nothing in the legal arguments petitioner advanced on brief causes us to weigh those competing factors differently.

a.  Whistleblower's Factual Burden in Justifying Anonymity

Petitioner first suggests that this Court, in considering a whistleblower's motion under Rule 345(a) for permission to proceed anonymously, must accept as true any factual allegations the whistleblower makes in support of his motion. Petitioner observes that Rule 345(a) provides that a whistleblower's motion for permission to proceed anonymously may be filed "with or without supporting affidavits or declarations". And, citing our Opinion in Whistleblower 12568-16W v. Commissioner, 148 T.C. 103, 106 (2017), he asserts that, consistent with the latitude granted by Rule 345(a), "**the Tax Court has 'accepted as true' whistleblowers' factual assertions 'for purposes of disposing of [their]**

**[\*41] motion[s]."** Thus, he seems to view the relevant legal standard as requiring him only to "state specific facts * * * that provide a 'sufficient * * * basis' to believe that the legitimate interests in anonymity outweigh the legitimate interests in disclosure." In petitioner's apparent view, the credibility of the stated facts do not matter because the Court must accept those facts as true.

In our Opinion in Whistleblower 12568-16W v. Commissioner, 148 T.C. at 106-107, we referred to various facts that we had "accepted as true" in two prior opinions: Whistleblower 11332-13W v. Commissioner, T.C. Memo. 2014-92, and Whistleblower 10949-13W v. Commissioner, T.C. Memo. 2014-94. In neither of the two prior cases, however, did we unquestioningly accept the allegations made in support of the motions before us. Instead, we accepted those allegations only because we found them credible.

Whistleblower 11332-13W addressed a whistleblower's motions to both proceed anonymously and to seal the record. Each motion was supported by an affidavit of the whistleblower's counsel. We described the affidavit in support of the motion to seal the record as having "demonstrate[d] several key facts." Whistleblower 11332-13W v. Commissioner, at \*8. And those facts, in turn, "demonstrated that the whistleblower and the whistleblower's family * * * [were] at significant risk of severe physical harm if the case does not remain sealed." Id.

**[\*42]** at \*9. We did not accept without question the factual allegations made in support of the motion. Instead, finding the facts to have been "demonstrated", we accepted the allegations as true because we found them to be credible.[8]

Petitioner not only misreads our description in Whistleblower 12568-16W of our treatment of factual allegations made in support of the motions at issue in Whistleblower 11332-13W and Whistleblower 10949-13W, he also misreads the text of Rule 345(a). While the Rule does not require supporting affidavits or declarations, it does require a whistleblower who moves for permission to proceed anonymously to provide "a sufficient, fact-specific basis for anonymity." If the whistleblower does not do so by means of affidavits or declarations, as was done in

---

[8]In addressing the whistleblower's motion for permission to proceed anonymously in Whistleblower 11332-13W v. Commissioner, T.C. Memo. 2014-92, at \*11-\*12, we employed a shorthand description of our reasoning process, writing: "The facts alleged in the petition and the affidavit attached to the motion to proceed anonymously demonstrate that disclosure of the whistleblower's identity could result in the risk of retaliation, social and professional stigma and economic duress." And we employed that same formulation in addressing the Rule 345(a) motion filed by the whistleblower in Whistleblower 10949-13W v. Commissioner, T.C. Memo. 2014-94, at \*6. But those shorthand formulations should be read in the context of our description of the affidavit submitted in support of the motion to seal the record in Whistleblower 11332-13W. In each case, the mere allegation of facts did not demonstrate potential harm from disclosure. Instead, because we found the allegations credible, we accepted the document in which they were made as having demonstrated the facts that, in turn, demonstrated the potential harm from disclosure.

**[*43]** <u>Whistleblower 11332-13W</u> and <u>Whistleblower 10949-13W</u>, he must do so by other means.

### b. Prior Protection of Identity

Petitioner also suggests that protection of his anonymity thus far in the case weighs in favor of continuing to protect his anonymity by granting his motion.  In <u>Sealed Plaintiff v. Sealed Defendant</u>, 537 F.3d at 189-190, the Court of Appeals for the Second Circuit provided a nonexclusive list of 10 factors to be considered in evaluating a plaintiff's request for anonymity.  The seventh factor on the list is "whether the plaintiff's identity has thus far been kept confidential".  <u>Id.</u> at 190.  In <u>Whistleblower 14106-10W v. Commissioner</u>, 137 T.C. at 193-194, we restated the <u>Sealed Plaintiff</u> list of factors and noted, in passing, <u>id.</u> at 205, that "[t]he parties agree that * * * [the whistleblower's] identity * * * has been kept confidential so far."  Quoting <u>Whistleblower 14106-10W</u>, petitioner asserts "**interest in preserving anonymity is particularly strong when a person's 'identity as a whistleblower has been kept confidential so far' in the proceedings**."

Petitioner misreads <u>Whistleblower 14106-10W</u> and the authorities that identify prior confidentiality as a factor in evaluating a request for anonymity.  The import of the "prior confidentiality" factor is not that prior preservation of confidentiality weighs in favor of continuing to preserve confidentiality.  The

**[\*44]** point, instead, is that prior acts by the party seeking anonymity that disclose that party's identity undermine the party's claim to protection of anonymity from the courts.

The prior confidentiality factor also traces back to Professor Steinman's paper.[9]  She listed first on her list of factors that favor confidentiality "the extent to which the identity of the litigant has been kept confidential."  Steinman, supra, at 38.  As Professor Steinman explained:  "If the information has been publicized or freely disclosed by the party seeking pseudonymity, there is little privacy to protect."  Id.  Thus, it would be more accurate to say that prior disclosure weighs against preservation of anonymity.  Prior protection of anonymity, under Professor Steinman's reasoning, should be viewed as a neutral factor.  That a party's identity has not been disclosed before a court's ruling on a party's request for anonymity

---

[9]The lineage of the prior confidentiality factor from Professor Steinman's paper to Whistleblower 14106-10W v. Commissioner, 137 T.C. 183, is essentially the same as that of the purely legal issue factor.  The District Court for the Eastern District of Pennsylvania cited Professor Steinman's paper in Doe v. Provident Life & Accident Ins. Co., 176 F.R.D. 464, 467-468 (E.D. Pa. 1997).  The District Court for the Southern District of New York cited Provident Life & Accident in Doe v. Del Rio, 241 F.R.D. 154, 157 n.4 (S.D.N.Y. 2006).  The Court of Appeals for the Second Circuit cited Del Rio in Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 190 (2d Cir. 2008).  And we cited Sealed Plaintiff in Whistleblower 14106-10W v. Commissioner, 137 T.C. at 193-194.

**[*45]** hardly means that the public interest in continuing to protect that party's anonymity is, as petitioner would have it, "particularly strong".[10]

More fundamentally, petitioner's problem in the case before us is not that we doubt his factual allegations. Instead, we are unwilling to draw the conclusions petitioner would have us draw from the alleged facts. We have no reason to doubt that petitioner and his wife (and perhaps members of their extended family) are financially dependent on the RIA. Nor do we have reason to question the RIA's reliance on Firm Y for necessary custodial services. But accepting those facts as true does not establish that the potential harm to petitioner and his wife from disclosure of his identity is so great as to outweigh the countervailing societal interests. How Firm Y and clients of the RIA would respond were they to learn of petitioner's whistleblowing activities are not matters of fact. Assessing the possible reactions requires prediction. And the facts petitioner alleges to support his predictions in that regard, even accepting them as true, do not justify those predictions. In our initial Opinion, we characterized as "speculative" petitioner's fears regarding the effects that disclosure of his identity would have on the RIA.

---

[10]Under petitioner's apparent reasoning, the longer a court takes in deciding whether to grant a request for anonymity, the more the court should be compelled to grant the request.

**[*46]** <u>Whistleblower 14377-16W v. Commissioner</u>, 148 T.C. at 517. He might have supported those fears by providing evidence of additional facts, such as how Firm Y or clients of the RIA or similar firms have responded to other circumstances. He did not. His fears rest only on surmises about how those parties might act--surmises that they might act in admittedly irrational ways to such an extent as to materially harm the RIA's business. Petitioner has not sufficiently demonstrated, on the basis of knowable facts, that the prospect that the other parties would act as he fears is sufficiently likely to justify granting his motion for permission to proceed anonymously.

c.    <u>Identity of Opposing Party</u>

Petitioner seeks to distinguish a tax whistleblower's right to anonymity from that of a litigant in a suit between two private parties. In <u>Doe v. Shakur</u>, 164 F.R.D. 359, 361 (S.D.N.Y. 1996), the District Court for the Southern District of New York included in its list of factors to consider in evaluating a request for anonymity "whether the plaintiff is challenging governmental activity". As the court explained: "Whether the defendant is a governmental entity or a private defendant is significant because governmental bodies do not share the concerns about 'reputation' that private individuals have when they are publicly charged with wrongdoing." <u>Id.</u> at 361 n.1. Challenges to governmental activity "involve

**[*47]** no injury to the Government's 'reputation'". <u>S. Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe</u>, 599 F.2d 707, 713 (5th Cir. 1979). By contrast, "the mere filing of a civil action against other private parties may cause damage to their good names and reputation and may also result in economic harm." <u>Id.</u> Consequently, "[b]asic fairness dictates" that plaintiffs filing claims against other private parties "must do so under their real names." <u>Id.</u>

The explanations of the "government or private defendant" factor given by the courts in <u>Shakur</u> and <u>Wynne & Jaffe</u> suggest that the defendant's status as a private party weighs in favor of disclosing the plaintiff's identity while the factor should be neutral when the defendant is a governmental entity. In <u>Del Rio</u>, however, the District Court for the Southern District of New York offered a rationale for the Government or private party defendant factor under which the defendant's status as a Government agency would weigh in favor of protecting the plaintiff's identity. As that court explained: "[W]hen a plaintiff challenges governmental or pseudogovernmental action, the judicial process serves as a significant check on abuse of public power. Thus, * * * it is in the public interest that the price of access to the courts not be too high." <u>Del Rio</u>, 241 F.R.D. at 158.

On the basis of that caselaw, petitioner argues:

Clearly this [that is, whether the opponent of the party seeking anonymity is a governmental or private party] is a matter the courts

[*48] consider very important.  Transparency is important, but primarily to protect the rights of citizens, not to feed Gossip Mills with non-substantive information on "who blew the whistle".  One private party bringing suit against another private party and expecting anonymity is clearly problematic.  Private parties should not be required to enter into litigation without the opposing party ("their accuser") being identified.  This is fundamental fairness.  * * *  However, in this instance, respondent, the opposing party[,] is fully aware of the identity of petitioner.  There is nothing whatsoever to be protected as it relates to respondent.  Further, where suit is brought against the government, the duties of the law must shift.  In petitioner's view they must serve to protect the citizen against a large and potentially vengeful government with essentially unlimited power and resources.  **The government should not be allowed to be in a position of inflicting pain, suffering and financial harm or destruction on its "opponents" (aka citizens).**  This is all the more true where the supposed "opponents" have stepped forward **at the request of that same government and it's** [sic] **Congress,** making great sacrifice and investing thousands of hours on their behalf and **ENABLING** that government to collect many hundreds of millions, perhaps billions of dollars.  For the government to then come back and unmask and otherwise attack such citizens represents a reprehensible BROWN SHIRT TACTIC that every American should find both disgusting and disconcerting.

We agree with petitioner that, under the rationale for the Government or private defendant factor given by the courts in Shakur and Wynne & Jaffe, that factor does not weigh in favor of disclosing petitioner's identity.  Disclosure of his identity is not required as a matter of basic fairness to respondent.  As petitioner observes, respondent already knows who he is.  And, as the courts have recognized, the Government does not have a significant reputational interest equivalent to those of private parties.

[*49] We disagree, however, with petitioner's implicit claim that, under the rationale provided in Del Rio, the Government or private defendant factor weighs in favor of protecting his anonymity. Petitioner's request that we review the WBO's determination not to grant him an award because it collected no proceeds on the basis of his information does not seek to check an abuse of public power. As respondent observes, the case before us "is, in essence, a suit claiming that the government owes petitioner money". The withholding of moneys allegedly owed is not a power unique to the Government.

Declining to allow whistleblowers to proceed anonymously as a matter of course might, at the margins, deter the filing of petitions for the Court to review WBO determinations. Even so, "[w]e * * * permit a whistleblower to proceed anonymously [only] if the whistleblower presents a sufficient showing of potential harm that outweighs counterbalancing societal interests in knowing the whistleblower's identity." Whistleblower 14377-16W v. Commissioner, 148 T.C. at 515. As noted supra part I.A., in applying that balancing test, we give less weight in a whistleblower case to the public's interest in knowing who is using the courts because of society's competing interest in encouraging whistleblowers to come forward. See Whistleblower 14106-10W v. Commissioner, 137 T.C. at 205 (characterizing the social interests at stake in a whistleblower case as "mixed"

**[\*50]** because of the "strong social interest" in protecting the identities of confidential informants).

Petitioner's argument that the identity of his opponent weighs in favor of protecting his identity does not rest on anything unique to his own circumstances. He suggests that whistleblowers' identities must be protected to avoid unduly deterring whistleblower claims. We have already taken that general concern into account in evaluating the "mixed" social interests at stake. Id. And we have already found that, even taking into account society's general solicitude toward protecting whistleblowers' identities, petitioner has not made a sufficient showing of potential harm to offset the public interest in disclosure.

### d. Risk to Nonparties

Petitioner suggests that the potential risk to his wife should be given additional weight in the balancing of the relevant factors. He argues that "**the courts have been clear that innocent third parties should be FULLY protected from un-masking**."

Petitioner's argument again misses the mark. As noted supra in part I.B., the Court of Appeals for the Fourth Circuit in James, 6 F.3d at 238, included in a partial list of relevant factors to be considered in evaluating requests for anonymity "whether identification poses a risk of retaliatory physical or mental harm to the

**[*51]** requesting party or even more critically, to innocent non-parties". It is far from clear, however, that petitioner's wife is an innocent nonparty. As indicated above, petitioner's wife is involved, at least to some extent, in the whistleblower claims her husband has filed and, according to his testimony, supports and believes in those claims.

Even if we were to accept that we should give more weight to potential harm to petitioner's wife than to petitioner himself, petitioner has not established that the potential harm to them collectively outweighs the societal interest in disclosing his identity. As noted <u>supra</u> part I.C.2.a., petitioner's wife admitted that she has no fear that she would be physically harmed as a result of disclosure of her husband's identity as a whistleblower. Petitioner did not establish that his wife faced any greater risk of harm to social relationships than he did. And while any harm to the RIA would impact her at least as much as it would petitioner, they have not demonstrated that their concerns are sufficiently grounded in fact to outweigh the public's interest in disclosing petitioner's identity.

### 4. Conclusion

We conclude that petitioner has not established that the potential harm that he and his wife would face as a result of disclosure of his identity in the present case is sufficient to outweigh "counterbalancing societal interests in knowing * * *

**[*52]** [his] identity." <u>Whistleblower 14377-16W v. Commissioner</u>, 148 T.C. at 515. None of petitioner's legal arguments calls into question that weighing of the relevant interests. Therefore, we will deny petitioner's motion under Rule 345(a) for permission to proceed anonymously.

II.      <u>Respondent's Motion for Summary Judgment</u>

   A.      <u>Introduction</u>

We review WBO determinations under section 7623(b)(4) for abuse of discretion, and that review is generally limited to the administrative record. <u>Kasper v. Commissioner</u>, 150 T.C. 8, 14-23 (2018).

In respondent's description, the administrative record he submitted in this case "consists of the Whistleblower Office's administrative claim file redacted for section 6103 and statutory privileges." Section 6103(a) generally requires that "[r]eturns and return information" be kept "confidential". Section 6103(h)(4), however, allows "return or return information" to be "disclosed in a Federal or State judicial or administrative proceeding pertaining to tax administration". The regulations confirm that whistleblower administrative proceedings are described in section 6103(h)(4). <u>See</u> sec. 301.6103(h)(4)-1(a), Proced. & Admin. Regs. Therefore, the WBO "may disclose returns and return information * * * to a whistleblower (or the whistleblower's legal representative, if any) to the extent

[*53] necessary to conduct a whistleblower administrative proceeding". <u>Id.</u> para. (b).

As we explained in <u>Van Bemmelen v. Commissioner</u>, 155 T.C. 64, 74 (2020), "[a]bsent a substantial showing made with clear evidence to the contrary, an agency is presumed to have properly designated the administrative record." Nonetheless, we allow supplementation of the administrative record to "includ[e] evidence that should have been properly a part of the administrative record but was excluded by the agency". <u>Id.</u> at 73. In limited circumstances, we will also consider "extrajudicial evidence that was not initially before the agency". <u>Id.</u> Considering extrarecord evidence, however, "is the exception, not the rule." <u>Id.</u> at 76 (quoting <u>Theodore Roosevelt Conservation P'ship v. Salazar</u>, 616 F.3d 497, 514 (D.C. Cir. 2010)).

Summary judgment normally expedites litigation. It is intended to avoid unnecessary and expensive trials. It is not, however, a substitute for trial and should not be used to resolve genuine disputes over issues of material facts. <u>E.g.</u>, <u>RERI Holdings I, LLC v. Commissioner</u>, 143 T.C. 41, 46-47 (2014). As a general rule, "[t]he party moving for summary judgment has the burden of demonstrating that no genuine issue as to any material <u>fact</u> exists, and that he is entitled to judgment as a matter of law." <u>Casanova Co. v. Commissioner</u>, 87 T.C. 214, 217

**[\*54]** (1986).  Under Rule 121(d), a party opposing summary judgment "may not rest upon mere allegations or denials" but must instead "set forth specific facts showing that there is a genuine dispute for trial."

The usual summary judgment standards provided in Rule 121 are "not generally apt where we must confine ourselves to the administrative record to decide whether there has been an abuse of discretion."  Van Bemmelen v. Commissioner, 155 T.C. at 78.  In a case governed by the record rule, granting a motion for summary judgment cannot serve its usual purpose of "avoid[ing] unnecessary trials" because "there will not be a trial on the merits" in any event. Id. at 79.  "In such a case involving review of final agency action * * *, summary judgment serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Id.

B.     Respondent's Grounds for Summary Judgment

In support of his motion for summary judgment, respondent asserts that "the IRS did not collect any proceeds based on petitioner's information on any issues, as required by I.R.C. § 7623(b) in order for a whistleblower to receive an award." That assertion is supported by Ms. Lensink's Form 11369 and by the "e-trak" entry

[*55] in which Mr. Glikman describes his unsuccessful efforts to identify collected proceeds as a result of the exam conducted on the basis of petitioner's information.

Although the name of the taxpayer on Ms. Lensink's Form 11369 is redacted, the form does identify petitioner and his wife as the whistleblowers. And the descriptions provided in the attachment to the form of the four issues in regard to which the "Informant" provided information are substantially identical to those petitioner provided in his Form 211. We therefore accept that the form addresses the information petitioner provided. Ms. Lensink's Form 11369 states that the issue regarding like-kind exchanges was the only one considered in examining the target taxpayer and the resulting adjustments were "net favorable" to the taxpayer. And that statement is consistent with the results of Mr. Glikman's review of the e-trak system, which identified "no collected proceeds as a result of exam."

C.    Petitioner's Arguments

Petitioner submitted both a reply in opposition to respondent's motion (reply) and a supplement to that reply (supplement). Notwithstanding petitioner's arguments, which we can distill into four categories, we find that the administrative record supports respondent's assertion that the IRS collected no proceeds on the basis of any of the information petitioner provided. Consequently,

**[*56]** the WBO did not abuse its discretion in denying petitioner an award.  We explain below why petitioner's arguments do not convince us otherwise.

1.      Evidence of Collected Proceeds

First, petitioner claims that the actions respondent undertook on the basis of his information resulted in the collection of "some $95,364,000 in taxes or reduced refunds from * * * [the target] on issues precisely associated with * * * [his] allegations."  According to petitioner, the target "paid $186,962,000 during the years 2009 through 2015--years commensurate with and following * * * [his] claim allegations".  Petitioner describes the "allegations" he made in his Form 211 as not "relat[ing] specifically to any particular accounting period".  Instead, those allegations "relate to deficiencies in tax **process** which carry back in time, through years of development and continue from February 12, 2010, forward until such time as the alleged tax malfeasance is corrected and resolved."  In contrast to the target's alleged tax payments from 2009 to 2015 of $186,962,000, petitioner contends that "only $91,598,000 of taxes (net of expected refunds) were associated with accounting income during those periods."  "The difference of $95,364,000", petitioner concludes, "necessarily relates to Federal Income Tax Deficiencies imposed."

**[\*57]** Petitioner goes on to claim that "[f]urther taxes were collected" from the target in 2016 and 2017, resulting in cumulative collections of $126,079,000 "on issues precisely associated with allegations."  In a footnote at the end of that sentence, petitioner advises:  "Pertinent Forms 10-K and related Tax Footnotes, to the extent no [sic] contained in EXHIBITS are hereby incorporated by reference."

Petitioner dismisses as "total Malarky" [sic] Mr. Glikman's claim that he determined, on the basis of his review of e-trak, that no proceeds were collected in petitioner's case.  Petitioner says he "personally advised" Mr. Glikman "of some $100,000,000 of collected proceeds in this matter relating to petitioner allegations" and that Mr. Glikman "made no effort to make appropriate inquiries or document same."  Petitioner contends that Mr. Glikman "intentionally ignored these important facts."

Petitioner concludes with the following admonition:

> IF THE COMMISSIONER COLLECTS TAX PROCEEDS ON SPECIFIC ALLEGATIONS RAISED BY WHISTLEBLOWERS AND THEN DENIES SUCH COLLECTIONS AND IS NOT HELD ACCOUNTABLE BY THE TAX COURT DESPITE BLACK AND WHITE EVIDENCE WITHIN PUBLICLY-AUDITED [sic] FINANCIAL STATEMENTS OF SUCH COLLECTIONS,

**[\*58]** THEN THE COURT IS NOT DOING ITS JOB IN SERVING THE PUBLIC'S INTEREST AND PROTECTING LAWS-- SUCH AS THE TAX WHISTLEBLOWER LAW--WHICH HAVE BEEN ENACTED FOR THE BETTER GOOD OF SOCIETY.

Petitioner has not adequately documented the figures he presents to establish that respondent collected approximately $126 million of proceeds on the basis of the information he provided. The figures on which petitioner relies appear in what seem to be spreadsheets of his own creation that are excerpted in his reply. He admits that he has not provided all of the documents from which he purportedly drew those figures.[11]

Moreover, the documents on which petitioner apparently relied are not part of the administrative record. Even if petitioner had submitted all those documents, we could consider them only if petitioner were to establish that they meet one of the exceptions to the record rule. In identifying exceptions to the record rule in whistleblower cases, we follow the precedents of the Court of Appeals for the District of Columbia Circuit, to which appeal of those cases would lie. See sec. 7482(b)(1); see also Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d

---

[11]The only Form 10-K for the target taxpayer that we find attached to petitioner's reply is for a fiscal year ending in 2009.

[*59] 985 (10th Cir. 1971).  Addressing that question in <u>Am. Wildlands v. Kempthorne</u>, 530 F.3d 991, 1002 (D.C. Cir. 2008), the D.C. Circuit wrote:

> We do not allow parties to supplement the record "unless they can demonstrate unusual circumstances justifying a departure from th[e] general rule."  <u>Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.</u>, 940 F.2d 685, 698 (D.C. Cir. 1991).  We have recognized such circumstances in at least three instances, <u>see James Madison Ltd. by Hecht v. Ludwig</u>, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (collecting cases):  (1) "[T]he agency deliberately or negligently excluded documents that may have been adverse to its decision," <u>id.</u>; (2) "the district court needed to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors," <u>id.</u>; or (3) "the agency failed to explain administrative action so as to frustrate judicial review," <u>id.</u> (internal quotation marks and brackets omitted).[12]

Although petitioner asserts that "volumes of public data indicat[e] collections exceeding $100M specific to Petitioner's allegations", he has shared with us very little of those data and has not explained how they fall under one of the limited exceptions to the record rule.  Even if we were to accept that the target paid more than $95 million in tax deficiencies between 2009 and 2015, petitioner's

---

[12]The D.C. Circuit's reference to "at least three instances" in which extrarecord evidence may be considered, <u>Am. Wildlands v. Kempthorne</u>, 530 F.3d 991, 1002 (D.C. Cir. 2008), suggests that it viewed that list as nonexclusive and accepted the possibility of other "unusual circumstances" that would justify the consideration of extrarecord evidence.  In <u>City of Dania Beach v. FAA</u>, 628 F.3d 581, 590 (D.C. Cir. 2010), however, the court described <u>Am. Wildlands</u> as having "held that the record can be supplemented in three instances", which suggests that the list may have become exclusive.

**[*60]** assertion that those deficiencies arose from "issues precisely associated with

* * * [his] allegations" appears to be mere conjecture.[13]

### 2. Alleged Inadequacy of Administrative Record

Second, petitioner argues that the administrative record is deficient and thus

requires supplementation:

> It is clear from the public record that NT1 [the target] remitted some $126,000,000 to the IRS on issues associated with Petitioner [sic] allegations, [but] Respondent argues that there were no collections. In this regard, the administrative record is clearly deficient and in error and needs to be supplemented with a thorough documentation of facts and surrounding monies collected. Pursuant to Kasper, 150 T.C. No. 2, "An agency's failure to consider relevant factors is one of the recognized exceptions to the record rule." All contents of the true administrative file need to be made available to Petitioner, and the administrative file must be supplemented as necessary to explain the stark discrepancies between the Commissioner's assertion that no taxes were collected and clear facts which exist to the contrary. Clearly, there were substantial tax collections. Clearly, those collections closely followed with Petitioner's allegations. There must be appropriate discovery before any attempt can be made to assess the

---

[13]Petitioner identified the tax deficiencies he alleges by comparing what he asserts to have been tax payments by the target and its reported tax expense. Petitioner apparently reasons that any excess of payments over reported expense would necessarily be attributable to deficiencies. We are unconvinced by petitioner's logic. In petitioner's description, deferred tax assets and liabilities arise from "differences in tax law and accounting rules [that] provide for different reporting periods". Accepting that description as accurate, an excess of current tax payments over reported tax expense could be attributable not to deficiencies but instead to the taxpayer's reporting of taxable income for a period that is larger than the net income for the period computed under Generally Accepted Accounting Principles.

[*61]  extent to which and what components of the $126,000,000 collected were "Based On" Petitioner's claims and allegations.[14]

Again, petitioner has not demonstrated that any of the three exceptions to the record rule recognized by the Court of Appeals for the D.C. Circuit applies in his case.  As noted above, that court allows extrarecord evidence when an agency deliberately or negligently excludes evidence, when supplemental background information is necessary to verify that the agency considered all relevant factors, and when the agency's explanation of its action is inadequate to allow for judicial review of that action.  Petitioner's speculations concerning the possible collection of proceeds and the calculations on which he bases those speculations do not demonstrate that the WBO "deliberately or negligently excluded documents" from the administrative record.  See James Madison Ltd. by Hecht, 82 F.3d at 1095.  Further, we have no reason to suspect that the WBO failed to consider the factors relevant to its determination to deny petitioner an award.  And the WBO explained

---

[14]Petitioner's supplement refers to email correspondence between him and WBO employees that, he alleges, was excluded from what he refers to as the "Administrative File" or "AF".  Petitioner finds that the omissions are "[v]ery suspicious" and, consequently, he "suspects FOUL PLAY."  He contends that the omissions are "indicative of a broken chain of command, less than competent handling of the subject claim, or efforts by the Commissioner to cherry pic [sic] facts for the purpose of avoiding responsibility for awards associated with the claim."  "At a minimum," he argues, the omitted emails "establish[] that the AF is incomplete and therefore inaccurate and unreliable."

**[\*62]** that it made its determination on the ground that "the information \* \* \* [petitioner] provided did not result in any additional tax, penalties, interest or additional amounts."

Moreover, petitioner's argument contradicts itself. He claims that the administrative record must be incomplete because it omits evidence of the proceeds that were "clearly" collected on the basis of the information he provided. But he also argues that he needs discovery to determine the extent to which the $126 million in payments he claims respondent to have collected from the target were attributable to the information he provided. Petitioner thereby admits that he does not now have evidence linking any collections to his information. As we explained in <u>Whistleblower 14106-10W v. Commissioner</u>, 137 T.C. at 188, quoting with approval <u>Keebler Co. v. Murray Bakery Prods.</u>, 866 F.2d 1386, 1389 (Fed. Cir. 1989), parties cannot justify their opposition to a motion for summary judgment by "saying, in effect: 'we have no factual basis for opposing summary judgment, but, if you stay proceedings, we <u>might</u> find <u>something</u>.'"[15]

---

[15]Petitioner overstates the significance of the emails respondent left out of the administrative record. Of the emails with WBO employees that petitioner identifies, the only ones we are unable to find in the record appear innocuous. In one, petitioner provides WBO Analyst Guadalupe Ortiz with an "'annotated copy' of 451 Regs" in the hope that it would "make \* \* \* [her] review easier." In another, a Robert Gardner wishes petitioner and his family "[b]est of holidays".

**[\*63]**     3.     <u>Redaction of Administrative Record</u>

Third, petitioner complains that "[t]he Administrative File [he received from respondent] was heavily redacted".  He views the redactions as "demonstrat[ing] that Respondent is engaged in a **<u>cover-up</u>** of any and all evidence supportive of Petitioner's position."

Without addressing section 6103, petitioner insists that "**<u>many of the redactions were critical to a meaningful review of the file</u>**."  The redactions, he says, "represent **<u>material omissions which create open questions of fact</u>**."  He claims entitlement "to this information which is highly pertinent as well as a critical and structural part of the administrative file."

Petitioner instructs us that it is "common practice" for respondent to "avoid its [sic] responsibilities under IRC 7623(b); [by] committing heavy redactions within its [sic] administrative file while isolating that file from immediately ensuing exam activity which gives rise to collections associated with Petitioner's claim."  In his case, he asserts, much of the information he provided was "maliciously hid" from the agents who examined the target taxpayer's returns for 2008 and 2009.  That misdirection facilitated the creation of an "'empty nest' administrative file."  Then "another team" was sent to conduct "the real audit".

**[\*64]** And that team, apparently armed with petitioner's information, was able to collect proceeds of "some $126,000,000".[16]

The WBO is authorized to disclose returns and return information only "to the extent necessary to conduct a whistleblower administrative proceeding." Sec. 301.6103(h)(4)-1(b), Proced. & Admin. Regs. Petitioner has not demonstrated that respondent redacted any "necessary" information.[17]

Petitioner would have us believe that those documents in the administrative record that evidence the absence of collected proceeds also include information, redacted by respondent, demonstrating just the opposite: that respondent in fact collected quite substantial proceeds. If respondent were engaged in a coverup, as petitioner alleges, we assume he would not have included evidence of collections in the documents he submitted and then redacted those portions of the record that evidenced collections; instead, he would simply have left out any evidence of collected proceeds.

_____

[16]Petitioner describes as "[g]errymandering" respondent's "common ploy" of "attempting to restrict information in the administrative file to a targeted period while HIDING THE FACT of Collected Proceeds garnered in examinations immediately following the period--sanitized and controlled, within the administrative file."

[17]It is not obvious how petitioner was able to determine that redacted information he has not seen is "highly pertinent" and "critical".

**[\*65]** We find no evidence in the record that substantiates petitioner's allegation that his information was deliberately withheld from the team that conducted the initial examination of the target's returns after petitioner filed his claim. In fact, the record includes evidence that contradicts petitioner's allegation. Mr. Lew, the Whistleblower SME, asked that Mr. Tuttle direct his exam team to examine petitioner's claim to determine the validity of his allegations.[18]

Petitioner's allegations are not only unsupported by the record, they are also logically dubious. If respondent had conducted two examinations to allow the fruitful examination to be "isolat[ed]" from the record of the unproductive one, he would have had no need for "heavy redactions" of the "empty nest" record to eliminate the evidence of collections.

---

[18]Petitioner describes as a "Red Flag" WBO analyst Pak's email of October 2, 2012, asking Mr. Tuttle, the exam team manager, about plans to examine "the informant issues". By that time, the WBO had already received Ms. Lensink's Form 11369, in which she described the results of investigations conducted on the basis of petitioner's information. Therefore, we interpret Analyst Pak's inquiries as having sought confirmation that no further investigation was ongoing--i.e., that the issues petitioner raised were not being investigated in an audit cycle subsequent to the one covered by Ms. Lensink's Form 11369. Analyst Pak's request for an audit plan and risk analysis would be consistent with an effort to verify that investigation of petitioner's issues did not extend into a then-ongoing audit. We do not view analyst Pak's October 2, 2012, email, or the chain in which it appears, as evidence of petitioner's claim that his "allegations were hidden from the first team" to examine the target after the WBO received his Form 211.

**[*66]**     4.     Petitioner's Reliance on Public Information To File Multiple Claims

Fourth, petitioner asserts that, "[i]n its Summary Basis for the Recommendation, the Respondent's IRS:WBO exhibited a pre-occupation [sic] with Petitioner's use of public information in his analysis and that Petitioner had provided information and assistance to the IRS/Treasury on multiple claims." Petitioner complains: "**Shockingly, Respondent even had the audacity to heavily redact the IRS:WBO Summary Basis for the Recommendation.**"

Petitioner argues that what he views as respondent's preoccupation "places a serious TAINT on the IRS: WBO's analysis and evaluation and Respondent's handling of this matter." He insists that "[i]t should be * * * clear to this Court that these criteria are * * * ILLEGITIMATE when it comes to assessing the merits of tax whistleblower claims." He invokes "USCA 17-1212"--an apparent reference to In re Sealed Case. (The number petitioner refers to appears to be the number the Court of Appeals for the D.C. Circuit assigned to the case.) He concludes:

> In view of evidence as to illegitimate considerations giving foundation to the IRS:WBO's evaluation and administration of Petitioner's claims, it becomes incumbent upon the Court to exercise its full powers and authority to ensure that satisfactory discovery takes place sufficient to arrive at fair and impartial conclusions with regard to awards due Petitioner relating to proceeds collected by the Commissioner.

**[*67]** Petitioner's complaint of arbitrary prejudice is unfounded. The unredacted portion of Mr. Glikman's final Award Recommendation Memorandum captioned "Summary Basis for the Recommendation" makes no mention of the number of claims petitioner filed or the source of the information on which he based them. We do not view as evidence of an inappropriate preoccupation the passing observation in the following section of the memorandum to petitioner's use of public information in "numerous other claims". The WBO did not deny petitioner's claim because he has filed multiple whistleblower claims on the basis of publicly available information. Instead, the WBO denied petitioner's claim because respondent collected no proceeds from the target on the basis of the information petitioner provided.

Moreover, even if the WBO's familiarity with petitioner made it skeptical of the merits of petitioner's claim, its referral of the claim for investigation led to the examination of one of the four issues petitioner identified. The record does not disclose the factors respondent considered in determining the extent to which examination of the other three issues was warranted. We cannot rule out the possibility that respondent took into account petitioner's status as a serial whistleblower claimant whose only sources of information about target taxpayers were available to the general public. Even so, it is not our place to second guess

[*68] respondent's exercise of prosecutorial discretion. As we affirmed in <u>Lacey v. Commissioner</u>, 153 T.C. 146, 167 (2019), "[t]he IRS and not the Tax Court decides whether and how to audit a taxpayer's return, and section 7623(b)(4) confers on the Tax Court jurisdiction not to supervise audits but to review the acts of the WBO." <u>See also</u> <u>Whistleblower 23711-15W v. Commissioner</u>, T.C. Memo. 2018-34, at *21 ("Our authority [in whistleblower cases] is limited to determining whether the IRS in fact collected proceeds; it does not extend to speculating whether the IRS might have collected proceeds if it had chosen to pursue an examination or if prosecutorial discretion had been exercised differently.").

Petitioner accepts that this Court "cannot dictate how the IRS conducts its examinations." But he makes the unfounded allegation that "<u>the IRS is accommodating Named Taxpayers and arranging to tax collections [sic] through under-the-table and underhanded mechanisms which avoid 'audit adjustments' <em>per se</em> so as to avoid paying Whistleblower Awards</u>." He suggests that "[t]here is a fine line * * * between the exercise of judgment and the balancing of resources and actions which rest upon improper motivations and where the Commissioner 'volunteers' lost revenues to the U.S. Treasury simply to avoid paying a whistleblower award."

**[*69]** Even if we had authority to judge the propriety of respondent's motivations, we would have no basis for concluding that it would be improper for him to consider the number of whistleblower claims petitioner filed and the source of the information he based them on. Contrary to petitioner's assertion, the Court of Appeals for the D.C. Circuit did not conclude that the number of claims filed by a whistleblower and the source of his information are illegitimate factors for assessing the merits of his claims. In re Sealed Case did not address the merits of petitioner's claim at all; it addressed only his motion for permission to proceed anonymously. And the appeals court was quite careful to circumscribe the extent of its agreement with petitioner. It listed four respects in which, in petitioner's view, we had abused our discretion in denying his motion. Because the court accepted the first of petitioner's four arguments--that we had "improperly considered", in denying petitioner's request for anonymity, "that he is a 'serial filer' using public information to make his whistleblower claims"--the court declined to consider petitioner's other three arguments. In re Sealed Case, 931 F.3d at 97-98. The court went on to list several points petitioner had made in support of the one argument it accepted. And it relied on only the last of those points to reject the reasoning on which we had denied petitioner's motion. According to the court, petitioner had claimed that "there is no reason to disfavor

**[*70]** filers in his position." Id. at 98. The court did not necessarily agree. Petitioner argued that "[n]either the whistleblower statute nor any precedent suggests a public policy disfavoring repeat filers or filers who rely upon publicly available information." Id. Again, the court did not necessarily agree. It agreed only that "disclosing * * * [petitioner's] name would not serve such a policy." Id. "It simply does not follow", the court opined, "that the public must know the serial filers' names in order to determine either the extent to which serial filers affect the work of the Tax Court or whether any particular whistleblower is a serial filer." Id. Thus, the court accepted, at least for the sake of argument, the possibility that public policy might indeed "disfavor[] repeat filers or filers who rely upon publicly available information." Id. Again, the court's agreement with petitioner was quite narrow: Identifying petitioner as a serial filer who relies on public information does not require disclosing his name.

For all of those reasons, the reference in Mr. Glikman's final Award Recommendation Memorandum to petitioner's having filed "numerous other claims, all based on publicly available information", does not give us grounds to conclude that the WBO abused its discretion in denying petitioner an award. Nor does that reference support petitioner's demands for additional discovery.

**[\*71]** D.    <u>Conclusion</u>

Again, we conclude that the administrative record respondent presented supports the WBO's determination to deny petitioner an award because no proceeds were collected on the basis of the information he provided. According to Ms. Lensink's Form 11369, the only adjustments made to the target's taxable income on the basis of petitioner's information were, on balance, favorable to the target.

Petitioner alleges that respondent engaged in an elaborate coverup, willfully hiding evidence of collections and knowingly presenting a false record to the Court. But petitioner has submitted no evidence to support those serious allegations. His claim that respondent collected over $126 million in proceeds "precisely associated with" the issues he raised rests on a comparison of the amount of tax payments he alleges the target to have made between 2009 and 2017 and the target's reported income tax expense during that period. But petitioner has not adequately substantiated either of the two amounts from which he derives his estimate of collected proceeds. Even if we were to accept that the target paid over $126 million in deficiencies between 2009 and 2017, we would have no basis for attributing them to the schemes petitioner described. In his demand for discovery, petitioner admits as much.

**[*72]** In short, petitioner is apparently unable to back up his serious allegations of malfeasance on respondent's part and asks us to allow him to seek evidence that would support them. We will not facilitate petitioner's efforts. Again, the administrative record supports the WBO's determination. Petitioner has advanced no acceptable reason to expand that record. Following the applicable scope of review, we conclude that the WBO did not abuse its discretion in denying petitioner an award. Accordingly, we will grant respondent's motion for summary judgment.

<u>An appropriate order and decision</u>

<u>will be entered</u>.